**UNITED STATES of America,
Appellant,**

v.

**Alfred DeCESARO et al., Appellees.**

**Nos. 73–1021, 73–1370 and 73–1364.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1973.

Decided Aug. 15, 1974.

Kiley, Senior Circuit Judge, concurred and filed opinion.

Robert Jay Vedatsky, Appellate Section, Criminal Division, U. S. Dept. of Justice, Washington, D. C., David B. Bukey, U. S. Atty., Milwaukee, Wis., for appellant.

Jay Schwartz, Racine, Wis., Eugene J. Brookhouse, Kenosha, Wis., Franklyn M. Gimbel, Dominic H. Frinzi, Raymond Matera, David J. Hase, Robert E. Sutton, Milwaukee, Wis., John E. Malloy, Kenosha, Wis., for appellees.

Before KILEY, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

An indictment returned in September 1971 in the Eastern District of Wiscon-

sin charged eleven persons with conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1] Thereafter, eight of those indicted moved to suppress evidence obtained through a wiretap order of February 15, 1971, which had been authorized by a United States district court judge pursuant to 18 U.S.C. §§ 2510–2520.[2] On November 1, 1972, prior to trial, the same judge who had earlier issued the wiretap order granted the defendants' motion to suppress the evidence obtained under that order.[3] The Government has appealed pursuant to 18 U.S.C. §§ 2518(10)(b), 3731.

While governmental interception of telephonic communications is the subject of stigmatic regard by those devoted to the preservation of civil liberties and the right of privacy, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., permits such electronic surveillance subject to the safeguards and restrictions of that Title. The statute has passed constitutional muster. United States v. Ramsey, 503 F.2d 524 (7th Cir. 1974); United States v. Cafero, 473 F. 2d 489 (3d Cir. 1973), cert. denied, 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974). Only one court has ruled, as far as we can ascertain, to the contrary, and that district court decision was reversed. See United States v. Tortorello, 480 F.2d 764, 774 n. 6 (2d Cir. 1973), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1974). The affidavit accompanying the application in the case before us asserts, and the district court in granting the application so found, that in the particular area of criminal activity here involved "normal investigative procedures reasonably appear unlikely to succeed." The district court adhered to this position in his order of suppression. 349 F.Supp. at 551.

To authorize a wiretap, a judge must determine that "there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter . . . . " 18 U.S.C. § 2518(3)(a). Violation of section 1955 is one of the offenses enumerated in section 2516. The district court on its second examination found that the affidavit in support of the wiretap application failed to establish probable cause that an auxiliary telephone subscribed to by appellee Germinaro and a tavern telephone subscribed to by appellee Thomas were being used for the operation of an "illegal gambling business," as defined in section 1955, or in aid of a conspiracy to conduct such a business. More particularly, the judge announced that he had "substantial doubts that the affidavit presents a probable cause showing sufficient to find" participation by five persons in the gambling business under 18 U.S.C. § 1955, 349 F.Supp. at 549, which would mean, in the specific language of 18 U.S.C. § 1955(b)(1)(ii), five persons who "conduct, finance, manage, super-

---

1. 18 U.S.C. § 1955 (1970), "Prohibition of illegal gambling businesses," reads in part:

    "(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years or both.
    "(b) As used in this section—
    (1) 'illegal gambling business'. means a gambling business which—
    (i) is a violation of the law of a State or political subdivision in which it is conducted;
    (ii) *involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business;*
    . . . . .

    (2) 'gambling' includes but is not limited to pool-selling, book making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." [Emphasis added.]

2. Four of the defendants who moved to suppress had not been named as alleged wrongdoers in the Government's wiretap application.

3. The district court's opinion and order of suppression is reported at 349 F.Supp. 546 (E.D.Wis.1972).

vise, direct, or own all or part of such business."

### The Warrant Application

█ The application for the warrant, subscribed to by Justice Department attorney Michael King, alleged that there was probable cause to believe that Alfred Frank DeCesaro, Eugene Francis Thomas, Angelo Germinaro, Ronald Leo Gregorski, Raymond James Matera, Kelly Covelli, Joseph Michael Buratti, and "others as yet unknown" had committed and were committing offenses involving the operation of an illegal gambling business, in violation of 18 U.S.C. § 1955. The application further alleged that these persons were conspiring to commit these offenses in violation of 18 U.S.C. § 371.[4] The participants supposedly were using two Kenosha, Wisconsin, telephones, 414–694–1795, subscribed to by Angelo Germinaro, and 414–657–3000, subscribed to by Gene F. Thomas at the Office Lounge.

The applicant claimed that the particular wire communications that the Government sought to intercept would concern

"The illegal operation of a gambling business relating to the placing and accepting of bets on sporting events and horse races, payment and collection of money bet . . ., laying off of bets on said sporting events and horse races, ·and their roles in the commission of said offenses."

To support the averment of probable cause, Government attorney King appended an affidavit by Special FBI Agent John Duffy, the agent who had supervised the investigation involved here. The extensive affidavit, occupying 26 pages in the appendix, *inter alia*, described "lay off" betting as follows:

"[A] bookmaking business of any size requires that the bookmaker balance his books . . . . In this way the bookmaker cannot be a loser . . . . [T]he large scale bookmaker . . . tak[es] those bets on a favorite in excess of those placed on the remainder of the participants in the contest and bet[s] them again with an even larger bookmaker who is able to balance his books by taking all of these excess bets from many bookmakers in different locations. This operation is known as 'laying off.' . . . [T]he bets thus insured are known as 'lay off bets.'"

Agent Duffy stated that his knowledge of this procedure was gained from his six years' experience as an investigator of gambling offenses. His definition comports with that given by the Government's brief on appeal and with that of the Report of the President's Commission on Law Enforcement and Administration of Justice in The Challenge of Crime in a Free Society at 189, on which report "Congress placed great reliance." United States v. Ceraso, 467 F.2d 653, 658 (3d Cir. 1972).

The information in the affidavit falls into several broad categories. (1) Information gained by the Bureau's confidential "numbered" sources from personal observation. (2) Information based, not on these sources' personal

---

4. The Government in its brief argues that the district court did not even consider whether the affidavit supporting the application established probable cause to believe that section 371 had been violated and that, in any event, the affidavit did establish probable cause as to conspiracy. The Government's reliance here is not upon any aspect of the admission of hearsay against co-conspirators inasmuch as hearsay, indeed hearsay upon hearsay, does not per se devitalize probable cause. See the general discussion in United States v. Carmichael, 489 F.2d 983, 986–987 (7th Cir. 1973). Rather, it is argued that to prove conspiracy (and presumably to show probable cause thereof) it is not necessary to show that the substantive offense actually had been committed by five persons.

The district court without articulating its reasoning as to conspiracy did conclude that there was no showing of probable cause of a conspiracy to violate the substantive section. Irrespective of the merit in the Government's position, although the indictment returned was for the substantive offense only, we do not need to reach the issue in view of the disposition at which we do arrive.

knowledge, but on comments they heard by persons later named in the affidavit. Some of these disclosures, primarily telephone numbers used for betting and the names of those accepting the bets, were subsequently verified by the FBI informers on a first-hand basis. (3) Information that the confidential sources attributed to their own unnamed sources, who were involved in Kenosha gambling activities and who, for the most part, were closely associated with DeCesaro. (4) Information that FBI special agents obtained through their own observations.

Most of the information in the affidavit came from reports by the FBI's confidential informants, whom the affidavit denominates as Sources Nos. 1 through 6. The affidavit devotes a paragraph to the background of each of these sources. All are Kenosha residents and are personally acquainted with at least one of the named alleged wrongdoers. Four are self-admitted gamblers who associate with other gamblers; one is a "bookie"; and one is a private citizen who volunteered information to the FBI.[5] Affiant

Duffy vouched for the accuracy of their past tips about criminal activity. With the exception of informant No. 5, whose statements we have disregarded for the purposes of this opinion, the reliability and credibility of these confidential sources were not challenged by the respondents in this appeal nor by the district court. Rather, their concern centers on the "credentials" of the sources used by the reliable confidential "conduits."[6]

*Evaluation of the Supporting Affidavit*

The Government on appeal asserts that the affidavit set forth adequate facts to justify a determination of probable cause: (a) Alfred DeCesaro headed a lay-off bookmaking operation in the Kenosha, Wisconsin, area; (b) Angelo Germinaro and Eugene Thomas acted as DeCesaro's main bookmakers, with the former handling horse betting at auxiliary line 414–694–1795, and the latter the other sporting events at 414–657–3000, the Office Lounge; and (c) five other persons (Buratti, Gregorski, Covelli, Matera, and Salerno) also took bets and laid them off on a regular basis ei-

5. The particulars about these informants are:

*Source No. 1*, a life-long resident of Kenosha and a self-admitted gambler, had furnished information to the FBI many times during the previous seven years. Independent investigation had established the accuracy of his tips. He is personally acquainted with DeCesaro, Thomas, and Germinaro.

*Source No. 2* had provided information at least five times since 1967, and the FBI had subsequently substantiated the information through independent investigation. He is a resident of Kenosha, a self-professed gambler, and knows DeCesaro, Thomas, Germinaro, Salerno, and Gregorski.

*Source No. 3*, a self-admitted bookmaker who deals with DeCesaro and his associates, had furnished information to Agent Duffy since 1968. His information had always been reliable.

*Source No. 4*, a self-professed gambler personally acquainted with DeCesaro, Thomas, and Germinaro, had given tips about criminal activities on at least twenty occasions since 1968. Subsequent investigations had proved the information reliable.

*Source No. 5* is a private citizen and lifelong Kenosha resident who, on his own initiative, came to the FBI with information.

He knows Buratti and his brother, owners of Buratti's Tap.

*Source No. 6* had furnished accurate information on three prior occasions. A self-admitted gambler and Kenosha resident, he claimed to have personal knowledge of Thomas's involvement in gambling activities.

6. Although many of the confidential sources reported directly to Agent Duffy, some spoke with other special agents involved in the Kenosha investigation. Further, the affidavit contains accounts of first-hand observations by agents other than the affiant. The information relayed by these agents to Duffy is therefore technically hearsay or double hearsay; however, the district court and the appellees do not claim that the cooperating agents inaccurately recounted the information they had acquired. *See* United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), where the Court suggested that policemen are presumed to be reliable, and that an affiant policeman need not give additional reasons for believing the report of another policeman; United States v. McCoy, 478 F.2d 176, 179 (10th Cir. 1973), cert. denied, 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62.

ther through Germinaro or Thomas or directly to DeCesaro. Therefore, it is contended, the district court should not have granted the defendants' motion to suppress.

■ The district court had no easy task.[7] The affidavit that the Government contends established probable cause apparently contained all the information the FBI had received on gambling activities in the Kenosha area in 1970 and early 1971, even though, as hereinbefore indicated, some of that information had been obtained from unvouched for, unnamed tertiary or perhaps even quaternary sources. The affiant's unclear style[8] compounds the problems created by the affidavit's length. However, we must keep in mind Chief Justice Burger's admonition that "[a] policeman's affidavit 'should not be judged as an entry in an essay contest.'" United States v. Harris, 403 U.S. 573, 579, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971). Furthermore, "affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

The major decisions establishing standards for assessing affidavits are Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). See generally Note, The Informer's Tip as Probable Cause for Search or Arrest, 54 Cornell L.Rev. 958 (1969); The Supreme Court, 1968 Term, 83 Harv.L.Rev. 177–81 (1969); The Supreme Court, 1970 Term, 85 Harv.L.Rev. 53–64 (1971). The principles of these Supreme Court cases have recently been applied in this circuit in United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973) (en banc). The district court relied heavily on Aguilar and Spinelli. It also relied to some extent on United States v. Kleve, 337 F.Supp. 557 (D.Minn.1971), which had been reversed, 465 F.2d 187 (8th Cir. 1972). The court did not cite Harris, and we decided Carmichael subsequent to the disposition of the appellees' motion to suppress in this case.

In Harris, the Court, reversing the Sixth Circuit, held that a police affidavit based largely on an informer's tip supported the magistrate's finding of probable cause for granting a search warrant. Joined by three other members of the Court,[9] Chief Justice Burger in the third section of his opinion stated that the informer's admission that he had committed an illegal act by purchasing the defendant's whiskey was an additional reason for crediting his tip. 403 U.S. at 583–584, 91 S.Ct. 2075. "Admissions of crime . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause tò search." Id. 403 U.S. at 583, 91 S.Ct. at 2082. Based in part on this passage in Harris, the majority in Carmichael, supra, stated that

---

7. We certainly cannot, and would not, fault a judge who is convinced he has made a mistake and with commendable judicial stature so indicates by reversing an earlier ruling. Nevertheless, it is to be regretted that the application with the supporting affidavit, which presumably was analyzed under the same legal standards at both examinations, was permitted to be the basis of further investigation which reached fruition in an indictment. An initial rejection of the application would have permitted efforts at ameliorative redrafting and resubmission without substantially destroying an investigation into

asserted violations of the federal criminal laws.

8. For a discussion of the problems created by the use of unclear language and vague attributions, see Burnett, Evaluation of Affidavits and Issuance of Search Warrants: A Practical Guide for Federal Magistrates, 64 J.Crim.L.C. 270, 273 (1973). Burnett is United States Magistrate, United States District Court, Washington, D.C.

9. Justices Black, White, and Blackmun concurred in Part III of the Chief Justice's opinion.

"[i]t is immaterial here that the concluding portion of Hussey's affidavit contained hearsay, namely, the statement of the second informant, *i. e.*, the possessor of the checks, to the first informant that the checks would be given by defendant Carmichael to John Doe . . . and then to Allen; that they were stolen from the mail; and that Carmichael, Allen and Doe would cash or cause them to be cashed. The statement by the second informant was an admission against penal interest, thus manifesting his reliability and constituting an exception to the hearsay rule. . . . The reliability of the second informant inheres in his statements against interest." 489 F.2d at 986.

Under *Harris* and *Carmichael*, the affidavit here sets forth sufficient information to establish probable cause that five or more persons were violating 18 U.S.C. § 1955.

The application clearly established probable cause that DeCesaro and Germinaro were engaged in a gambling operation. The affidavit reveals that DeCesaro not only knew and provided to others accurate information about how (telephone numbers) and with whom (Angelo Germinaro, Eugene Thomas) one could bet in Kenosha, but, that he personally handled the monies for certain transactions, *e. g.*, Source No. 2's bets with Germinaro. Reliable sources acquired this information from direct observation and participation. The same acceptable kind of information-gathering established that Germinaro had been taking bets over the course of several years and that the most recent number at which the reliable informants had reached him was one of the telephones that the FBI proposed to monitor pursuant to the warrant.

Indeed, the district court on its re-evaluation did not disagree with the conclusion as to DeCesaro and Germinaro, observing, "[t]here is a clear showing of probable cause that DeCesaro is engaged in *a* gambling business. It is further my finding that there exists probable cause to believe that Angelo Germinaro is a participant with DeCesaro in *a* gambling business." 349 F.Supp. at 549. (Emphases in the original.) We therefore turn in this context to an examination of the averments made as to some of the other persons named in the application and affidavit.

First-hand observations by trustworthy individuals also established that tavern operator Eugene Thomas was involved in gambling activities in Kenosha. Thomas was acquainted with DeCesaro, who knew of Thomas's gambling activities and disseminated information about them to would-be bettors. And Source No. 3 had repeated to the FBI a conversation he had had with DeCesaro in which DeCesaro had indicated that Thomas was one of his associates in DeCesaro's "lay off" bookmaking operation in the Kenosha area, an admission of criminal conduct by DeCesaro. See Wis. Stat. ch. 945 (1971). United States v. Harris, *supra;* United States v. Carmichael, *supra.* See also United States v. McCoy, 478 F.2d 176, 179 (10th Cir. 1973), cert. denied, 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62. "It is reasonable to believe that co-owners and operators of a business have personal and reliable knowledge as to the identity of their partners and associates." United States v. Kleve, 465 F.2d at 193. The telephone at Thomas's place of business was the other telephone that the FBI had specified in the application.

Gregorski's gambling activities at the tavern where Gregorski was employed as bartender were witnessed by at least four reliable sources. The report of the undercover policeman in particular makes it clear that Gregorski was forwarding his bets to someone. Source No. 3 confided that, from conversations with Gregorski and others, he had learned that the person for whom Gregorski was working was James Salerno. The affidavit discloses that Salerno knew that Gregorski was taking "action" at George's Bar; indeed, Salerno furnished gamblers with the phone number over which they could place bets

with Gregorski. Subsequent to No. 3's report, Source No. 2 stated that he had "learned through personal contact with" Gregorski that the bartender was forwarding his bets to Germinaro. If we read the affidavit's somewhat turgid phrases of attribution in a commonsense fashion, see *Bentresca, supra,* these two accounts indicate that Gregorski himself revealed to the confidential sources the incriminatory links to Germinaro and Salerno.

The affidavit further disclosed that another tavern operator, Joseph Buratti, regularly accepted bets and was involved with DeCesaro in this enterprise. Source No. 3 had obtained this latter piece of information from conversations he had had with Buratti and DeCesaro, among others.

Paragraph 48 of the affidavit, which the Government emphasizes on this appeal, provided in part:

"On January 29, 1971, source number three advised me that in conversations during . . . January 1971, with . . . DeCESARO, . . . COVELLI, . . . BURATTI, and others closely associated with these individuals, source number three learned that . . . DeCESARO remains in control of a large bookmaking operation in the Kenosha, Wisconsin, area. *Through conversations with the above-named individuals,* source number three learned sometime during . . . January 10, 1971, to January 23, 1971, that KELLY COVELLI, . . . BURATTI, and . . . MATERA continued to 'lay-off' with . . . DeCESARO." [Emphasis added.]

Fairly read, this paragraph alleges that DeCesaro, Covelli, and Buratti themselves directly informed one of the FBI's confidential sources of their criminal activities and further, of their ties with each other in those activities.

The most damaging allegations in the affidavit thus stemmed from first-hand observations by reliable sources and from mutually corroborating conversations these sources had with named persons who clearly and admittedly were engaged in illegal gambling activity. The sources' named sources satisfied the *Aguilar-Spinelli* two-pronged test [10] as explicated in *Harris* and *Carmichael.*

■ The affidavit does not present the situation adverted to in *Spinelli, supra,* 393 U.S. at 416, 89 S.Ct. at 589, of "a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." We are not unmindful that the affidavit's prolixity may have tended to obscure the fact that it did contain the flesh of probable cause. If some of the assertions taken out of context do not so qualify, this does not destroy the existence of probable cause; as is ordinarily the case with surplusage, they merely make the task of discernment less easy. Paragraph 48, read with knowledge of *Harris* and *Carmichael,* and the other information we outlined above were sufficient, to support the wiretap application.

We further note that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause . . . ." *Spinelli, supra* at 419, 89 S.Ct. at 590. If, as the defendants suggest, the persons named in the affidavit participated not in *a* gambling operation but in several different operations, the defendants will have the opportunity at trial to exploit the weakness of the prosecution's case under 18 U.S.C. § 1955. The affidavit indicates that Gregorski reported to

---

10. In Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Court held that, although an affidavit may be based on hearsay information, the application must (1) give some of the underlying circumstances necessary for an impartial evaluation of the informant's tip and (2) provide some of the underlying circumstances from which the affiant-officer had concluded that the informant was credible or his information reliable. In Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Court modified the two-pronged *Aguilar* test in order to reconcile it with previous cases, notably Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

Germinaro, who, in turn, was associated with DeCesaro. In addition, at least Thomas, Covelli, and Buratti also worked with DeCesaro in a gambling operation based on horse races and other sporting events.

### Inclusion of Lay-Off Bettors

■ We have held that the affidavit of Agent Duffy contained adequate allegations to support a finding of probable cause that five or more persons were conducting an illegal gambling business in the Kenosha, Wisconsin, area, in violation of 18 U.S.C. § 1955. In so holding we have included among the five, persons who were "laying off" with others and who might be considered to be in only indirect communication with the apparent head of the operation, De-Cesaro. The appellees, however, argue that even if the affidavit did show probable cause to believe that some of these men were making lay-off bets, the men may not be counted for purposes of the "five or more persons" clause. Federal jurisdiction extends to those "who conduct, finance, manage, supervise, direct, or own all or part of such business," 18 U.S.C. § 1955(b)(1)(ii), and lay-off bettors, the appellees assert, do not fall within this category. The contention is based upon the fact that Congress had not included in section 1955's proscription "the player in an illegal game of chance, . . . [and] the person who participates in an illegal gambling activity by placing a bet." 2 U.S.Code Cong. & Admin.News, 91st Cong., 2d Sess. (1970), at 4029 (H.Rep. No. 91–1549).

This court recently resolved this issue against the position urged by the appellees here, United States v. McHale, 495 F.2d 15 (7th Cir. 1974), at 18:

> "Defendant McHale contended that he was a 'lay off' bettor and although bets of this kind are made between bookmakers, he was not 'conducting' a gambling operation nor was he part of a 5-man business.
>
> "The only exclusions intended by Congress were the individual player or bettor and not the professional bookmaker who also in the course of his business bets. . . . 'As the House Committee Report stated, the term "conducts" is broad enough to include both "high level bosses and street level employees."' United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir. 1973) . . . . Certainly the lay off-bettor is a more obvious target of § 1955 than runners, salesmen, clerks, and watchmen."

*Cf.* United States v. Manson, 494 F.2d 804 (7th Cir. 1974); United States v. Becker, 461 F.2d 230, 232–33 (2d Cir. 1973), cert. pending.

In accordance with the foregoing opinion, we reversed the decision of the district court. The cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

KILEY, Senior Circuit Judge (concurring).

I concur in the majority opinion, except that I do not join in its reliance upon United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973) *(en banc)*, to sustain the wiretap order. I think United States v. Harris, 403 U.S. 573, 91 S. Ct. 2075, 29 L.Ed.2d 723 (1971), gives ample support to that order.

In the *en banc Carmichael* opinion, the majority, in the light of *Harris, supra,* found the second informant's statement to the reliable informant an admission against interest and permissible as reliable hearsay upon hearsay. My dissent in *Carmichael* was upon the ground that although the second informant's statement there was an admission against interest, and to that extent reliable, *Harris* did not compel a finding that the admission of that informant was sufficiently credible to carry the trustworthiness which the Supreme Court in *Harris* found in the statements of the informant there. I adhere to my dissent in *Carmichael* where, in my opinion, the facts were insufficient to establish the requisite second element of credibility under Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637

(1969), and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 723 (1964).

In *Harris, supra,* Chief Justice Burger made three general statements, starting 403 U.S. at p. 583, 91 S.Ct. at p. 2082, including the one quoted by Judge Pell. However, in the sentence following the third general statement the Chief Justice stated:

Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another.

And in the sentence following the quoted sentence above, the reason is given for crediting the *Harris* informant's admission. 403 U.S. p. 584, 91 S.Ct. 2075. The concession limiting the earlier general statements permits my adherence to my dissent in *Carmichael.*

Although neither party to this appeal has raised the question of whether the wiretap application was properly authorized, the record establishes that the application was properly authorized under the recent Supreme Court decisions in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), and United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974).