**UNITED STATES of America**

v.

**Robert CIAMACCO et al.**

**Crim. A. No. 72–150.**

United States District Court,
W. D. Pennsylvania.

July 30, 1973.

---

108

Samuel J. Orr, III, Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

James K. O'Malley, Morris, Safier & Makoroff, Pittsburgh, Pa., for Robert Ciamacco.

Thomas A. Livingston and John L. Doherty, Livingston & Miller, Pittsburgh, Pa., for Ned Cole.

## OPINION AND ORDER

MARSH, Chief Judge.

After a jury trial, at which the majority of the government's evidence was

presented via court-authorized wiretaps installed under authority of 18 U.S.C. §§ 2510–2520, Robert Ciamacco and Ned Cole (hereinafter defendants) were found guilty of violating the federal statute prohibiting illegal gambling businesses, 18 U.S.C. § 1955.[1] The defendants have filed a joint "Motion for New Trial and Judgment of Acquittal" assigning as reasons for the granting thereof that:

"1. The verdict was against the evidence.

"2. The verdict was against the weight of the evidence.

"3. The Court erred in each of its pretrial rulings and trial rulings as objections of the defendants appear in the transcripts and arguments to be filed."

In our opinion the motion should be denied.

The government had the burden of proving to the jury beyond a reasonable doubt that each of these defendants was one of five or more persons conducting an illegal gambling business which remained in substantially continuous operation for a period in excess of thirty

days or had a gross revenue of $2,000 in any single day.[2] United States v. Ceraso, 467 F.2d 653 (3d Cir. 1972); United States v. Williams, 459 F.2d 909 (6th Cir. 1972). Since the jury returned verdicts of guilty, the government is entitled to have the evidence viewed in a light most favorable to it, and have the benefit of all legitimate inferences which might reasonably be drawn from the proven facts. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Pizzi, 470 F.2d 681, 682 (3d Cir. 1972); United States v. Hamilton, 457 F.2d 95, 99 (3d Cir. 1972), and cases cited therein. So viewed, the evidence at trial established the following:

Beginning sometime in January, 1971, Samuel Levine began operating as a lay-off numbers bookmaker.[3] During the period from January, 1971 to July, 1971, he maintained separate lay-off accounts on behalf of Robert Ciamacco, Ned Cole and Samuel Levy, conducting his day-to-day business with them over the telephone located in his home. The taped telephone conversations heard at trial showed that Levine accepted numerous numbers bets from Robert Ciamacco[4] and from Ned Cole's em-

---

1. As to the other defendants named in the indictment, Samuel Levy pleaded guilty prior to trial, and a government motion to dismiss the indictment as to Anthony Crivelli was granted.

2. 18 U.S.C. § 1955 provides in pertinent part as follows:
 "*Prohibition of illegal gambling businesses*
 "(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 "(b) As used in this section—
 "(1) 'illegal gambling business' means a gambling business which—
 "(i) is a violation of the law of a State or political subdivision in which it is conducted;
 "(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 "(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein."

3. At trial Samuel Levine testified as an immunized witness concerning the nature and extent of the gambling business involved in this case. Levine identified the various voices recorded on the tapes and explained the nature of the conversations. His testimony was corroborated by the testimony of Judith Maker and Justina Cahill, two other immuized witnesses, and by the taped conversations heard at the trial.

4. See conversations 1–7, 9, 13, 15, 17–19, 64, 65, 67–69, 71, 72, 74, 75, 78, 79, 82, 83 and 86–91.

ployee, Judith Maker,[5] and discussed the status of their accounts with them.[6] In addition, Levine accepted numerous numbers bets from William Paul Kohne for Sam Levy's account.[7] Levine laid off his larger bets via telephone with Justina Cahill, admittedly a lay-off bet receiver employed by Tony Grosso.[8]

Levine explained that his function as a lay-off bookmaker was to accept responsibility for paying off on the numbers booked with him, thereby insuring the person laying off against a large loss if a particular number won. In return for accepting these risks, Levine would charge the person laying off 70% of the total amount wagered with him, but it was also agreed that the person on whose account a bet was laid off was entitled to a 50% interest in any profits Levine realized from all bets laid off on that account. This was called a "bankroll" arrangement by the parties.[9]

Levine's business, as described above, was in substantially continuous operation from January to July, 1971, and the defendants were participants in that business.[10]

These defendants attack the weight and sufficiency of this evidence contending at oral argument and in their joint brief that there was no evidence that Robert Ciamacco was accepting numbers bets from others and passing them on to Levine; that, in any event, laying off bets is not a violation of Pennsylvania law, and, therefore, cannot be punished under the federal statute; that the evidence showed that the defendants were involved in separate businesses, none of which involved five or more persons; and that the statute, 18 U.S.C. § 1955, is not aimed at the small gambling operation shown in this case. In addition, defendants assert that the pretrial ruling on the admissibility of the wiretap evidence was erroneous. We consider these contentions seriatim.

■ The contention that no evidence was presented proving that the defendant Ciamacco was accepting the numbers bets he called into Levine from other individuals, and, therefore, the evidence was consistent with his being a mere bettor, is without merit. The taped conversations involving Ciamacco contain numerous bets for varying amounts.[11]

5. See conversations 21–25, 27, 28, 30, 31, 33, 34, 112–120 and 122.

6. See conversations in footnote 4 and conversations 29 and 121.

7. See conversations 35–37(a), 39, 97–100, 102, 103, 105–108, and 110.

8. See conversations 51–57, 59, 123, 125, and 127–130.

9. Levine kept a running total of the amount bet on behalf of a particular account, and from this he would subtract all sums he had to pay out because of winning numbers laid off through that account. If more was bet through the account than was being paid out, Levine would retain this money until a certain minimum dollar figure, known as the "bankroll", was accumulated. After the "bankroll" amount was reached the person holding that account could withdraw 50% of anything over the minimum amount. If a person having an account with Levine decided to quite the numbers business, or lay off his numbers somewhere else, he was entitled to 50% of

anything Levine had in his particular account, on demand.

10. The first monitored call involving the defendant Ciamacco was on March 6, 1971 (conversation 1) and the last such call was on April 7, 1971 (conversation 91); a period of 32 days. The first monitored call involving defendant Cole's employee, Judith Maker, was on March 6, 1971 (conversation 21), and the last such call was on April 6, 1971 (conversation 122); a period of 31 days.

11. See conversations 1–7, 9, 13, 15, 17–19, 64, 65, 67–69, 71, 72, 74, 75, 78, 79, 82, 83, and 86–91. In conversation 9, for example, 120 numbers bets were laid off for amounts varying from $5 to $30 representing a total play of $1,295. In addition, in conversation 15, Levine inquired as to why Ciamacco was not laying off number 880 (a number which Ciamacco had been laying off regularly for $20 to $25); Ciamacco responded "that's [only] for five, *they* cut it way down." (Emphasis supplied.)

It is inconceivable that Ciamacco was placing all these bets for himself.[12] Furthermore, Sam Levine, who qualified as a gambling expert, was obviously of the opinion that Ciamacco was laying off bets he had received from other people,[13] and Ciamacco's lay-off bets fluctuated in a manner consistent with Levine's testimony concerning traditionally heavy and light days in the numbers business, i. e., heavy weekly play on Monday and light play on the race numbers on Saturday. In view of these impressive circumstantial facts, the jury was justified in drawing the inference that Ciamacco was accepting numbers bets from other people and laying some of them off with Levine; their judgment will not be disturbed.

 Nor can we agree with the defendants' alternative contention that even if the defendants were laying off bets they received from other people with Levine, this was not a violation of the law of Pennsylvania. While the Pennsylvania lottery law, 18 Purdon's Pa.Stat.Ann. § 4601, does not make it a crime to place a bet with a numbers writer, it does make it a crime to be "concerned in" or "substantially engaged in" conducting a lottery. Commonwealth v. Bufalini, 200 Pa.Super. 85, 92, 186 A.2d 645, 648 (1963); Commonwealth v. Paul, 177 Pa.Super. 289, 294, 111 A.2d 374 (1955); Commonwealth v. Wade, 156 Pa.Super. 88, 91, 39 A.2d 460, 461 (1944). Since the circumstantial evidence clearly supported the inference that the bets both defendants placed with Levine were not the defendants' personal bets,[14] their conduct in laying off bets was within the reach of the Pennsylvania statute.

 Defendants' contention that the evidence showed several separate businesses involving less than five persons, rather than one business involving at least five persons, is, likewise, devoid of merit. It is well established that all participants in the operation of an illegal gambling business, except customers placing bets, are conducting that business for purposes of § 1955. United States v. Ceraso, supra, 467 F.2d p. 656; United States v. Becker, 461 F.2d 230, 232 (2d Cir. 1972); cf. United States v. Palmer, 465 F.2d 697, 699 (6th Cir. 1972); United States v. Riehl, 460 F.2d 454, 459 (3d Cir. 1972); United States v. Harris, 460 F.2d 1041, 1049 (5th Cir. 1972). By engaging in his numbers lay-off business, Levine made it possible for persons maintaining an account with him, such as the defendants, to spread their risk of loss and insure the solvency of their operations; thus Levine's business was a necessary and indispensible part of any business which the defendants operated. While the defendants would be more aptly categorized as independent contractors rather than agents vis-á-vis the Levine business, all the people having accounts with Levine interrelated their private business with his in such a manner that they can, with reason, be deemed participants in his business. Moreover, the evidence showed that the defendants were the beneficiaries of what can fairly be described as a profit-sharing agreement, whereby Levine promised to remit 50% of everything he made from each account's patronage. The evidence was sufficient to find that seven persons—Judith Maker, William Paul Kohne, Samuel Levy, Justina Cahill,[15] and the defendants, Robert

---

12. See: Commonwealth v. Polite, 190 Pa. Super. 329, 154 A.2d 287 (1959), a case where 23 separate numbers on a slip of paper was sufficient to establish that it was a writer's list, not a player's.

13. Levine did state on cross-examination that it was "possible" that Ciamacco was placing these bets on his own behalf, but whether this "possibility" was a fact in this case was for the jury.

14. There was direct testimony by Judith Maker that the defendant Cole accepted bets on numbers from other people.

15. Although Justina Cahill was an employee of Tony Grosso, by accepting lay-off bets from Levine, she was a necessary and indispensible part of Levine's business, and, therefore, a participant therein. Cf. United States v. Riehl, supra, 460 F. 2d p. 459.

Ciamacco and Ned Cole—participated in the illegal gambling business operated by Levine so as to bring that business, and its participants, within subparagraph (b)(1)(ii) of § 1955.

Defendants next argue that the evidence does not show a major gambling business of the type Congress intended to regulate in passing 18 U.S.C. § 1955. The defendants point to the legislative history of § 1955,[16] and to the government's failure at trial to prove that Levine's business had a gross revenue of $2,000 in any single day. The use of the disjunctive in subparagraph (b)(1)(iii) of § 1955[17] clearly shows that 30 days of substantially continuous operation is an alternate and independent ground which establishes an illegal gambling business, regardless of what the proof may be concerning the gross revenue of the particular business. Continuity of the business alone is sufficient to establish a violation of the Act, United States v. Dimario, 473 F.2d 1046 (6th Cir. 1973), and as the legislative history cited by defendants shows, Congress merely *anticipated* that when the minimum requirements of the statute could be met, the business, in fact, would be of a greater magnitude than the government was able to prove. The government having met the minimal standards of the statute, the convictions of the defendants are valid. The actual magnitude of the gambling operation involved in this case is not a subject for inquiry after the minimum standards set by Congress have been met. It is a prosecutorial decision whether or not a case should be brought; it is a judicial decision whether or not a case has been proved. The judicial decision in this case, in light of the proof and the clear language of the statute, must be in the affirmative.

As an apparent corollary to the above argument, defendants cite Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), and United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), and argue that the statute is not clearly and plainly written since Mr. Levine had a copy of the statute, but, nevertheless, failed in his conscious efforts to manage his activities so as not to come within its reach. We believe the defendants' reliance on *Rewis, supra,* and *Bass, supra,* is misplaced. The statute involved here is clear and unambiguous and should have been so to Mr. Levine. Since the statute does not require knowledge of the size of an illegal gambling business, or even knowledge that a federal law proscribes such a business,[18] the only safe course for Mr. Levine to steer was to refrain from accepting lay-off bets involving five other persons (Ciamacco, Cole, Maker, Levy and Kohne) and laying off some of his bets with Tony Grosso, through Grosso's employee Cahill, over a substantially continuous period in excess of 30 days. Levine's failure to follow this course, rather than any ambiguity in the law which would invoke the rule of lenity, has resulted in the other participants in his business

16. 2 U.S.Code Cong. and Adm.News, 1970, p. 4029, discusses § 1955 and states:
"It is anticipated that cases in which their [sic] standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern * * *."

17. The relevant portion of § 1955 provides:
"(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which—
"* * *
"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days *or* has a gross revenue of $2,000 in any single day." (Emphasis supplied.)

18. See: United States v. Kohne, 358 F.Supp. 1053 (W.D.Pa.1973), citing United States v. Erlenbaugh, 452 F.2d 967, 973 (7th Cir. 1971), aff'd 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972), and United States v. Miller, 379 F.2d 483, 486–487 (7th Cir. 1967).

being exposed to a charge of federal felony. This is not a case where a statute is being applied to unusual or unanticipated facts; rather, this is precisely the type of organized, continuous, gambling operation that is covered by the statute.

 Finally, defendants contend that this court erred in its pretrial ruling refusing to suppress the evidence gathered via wiretap because the wiretaps were improperly authorized. We believe this objection was correctly disposed of prior to trial on the basis that the authorizations occurring in this case are factually and legally indistinguishable from those found acceptable in United States v. Ceraso, 467 F.2d 647 (3d Cir. 1972).[19] The affidavits in support of the wiretap applications and the court orders authorizing the wiretaps identify the former Attorney General of the United States, John N. Mitchell, as the official who designated the Assistant Attorney General, Will Wilson, to process these *particular* applications. On the same facts in *Ceraso, supra,* the Court of Appeals for the Third Circuit stated at p. 653:

> " * * * [W]e firmly believe that the documents are sufficiently clear on their face to withstand any attack * * *."

In any event, the subsequent affidavit filed by the former Attorney General (see Appendix "A" attached hereto) clearly informed the defendants of the identity of the official who authorized these wiretaps long before any evidence derived from them was used at trial.[20] While being far from perfect, the authorizations which occurred here are at least acceptable.[21]

An appropriate order will be entered.

19. The factual background concerning the particular affidavits involved in this case is set out in United States v. Kohne, 347 F.Supp. 1178, 1181–1182 (W.D.Pa.1972), and in an unpublished opinion denying the pretrial motions of these defendants.

20. The former Attorney General's affidavit was sworn to by him on June 9, 1972; the defendants were indicted on June 6, 1972, and dir covery motions were filed on their behalf in July, 1972. Any ambiguity concerning who authorized this wiretap was resolved at a very early date

## APPENDIX A.

### AFFIDAVIT

District of Columbia:

John N. Mitchell, being duly sworn, deposes and says:

I held the office of Attorney General of the United States from January 21, 1969, through March 1, 1972.

On February 1, March 3, March 24, and May 6, 1971, I approved requests for authority to apply for interception orders in this case and personally initialed memoranda of those dates reflecting my favorable action on the requests. I have examined the originals of these memoranda and certify that they all bear my initials which were personally affixed by me on February 1, March 3, March 24, and May 6, 1971, respectively. Attached are copies of my personally initialed memoranda of those dates reflecting my favorable action on the requests.

My memoranda of approval in this case constituted notification to the Assistant Attorney General of the Criminal Division that the discretionary action of approving each of the requests to make application to the court for an interception order had been taken by me.

(s) John N. Mitchell
_____
JOHN N. MITCHELL

Subscribed and sworn to before me this 9th day of June, 1972.

(s) Audrey Anne Crump.

My Commission Expires August 31, 1976.

for these defendants and, in fact, prior to the time that they made any inquiry concerning authorization.

21. We recognize that contrary authority exists in United States v. Chavez, 478 F.2d 512 (9th Cir. 1973), cert. granted 412 U.S. 905, 93 S.Ct. 2292, 36 L.Ed. 2d 969 (1973), but believe the Chavez case fails to recognize that the applications and court orders show that the Attorney General was acting on these requests on a case-by-case basis.