510 F.2d 1307
 UNITED STATES of America, Appellee,
v.
Eugene SCHAEFER, Appellant.
UNITED STATES of America, Appellee,
v.
Angelo DEL PIETRO, Appellant.
UNITED STATES of America, Appellee,
v.
Frank VINCERI, Appellant.
UNITED STATES of America, Appellee,
v.
Clifford LANCASTER, Appellant.
UNITED STATES of America, Appellee,
v.
James LONSBERRY, Appellant.
UNITED STATES of America, Appellee,
v.
John Edward VOGT, Appellant.
UNITED STATES of America, Appellee,
v.
William CHRISTOPHEL, Appellant.
 Nos. 73--1506, 73--1526, 73--1538, 73--1577, 73--1578,
73--1611 and 73--1617.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 25, 1974.
Decided Jan. 3, 1975.
Rehearings and Rehearings En Banc
Denied Feb. 27, 1975.
Certiorari Denied May 19, 1975.
See 95 S.Ct. 1975, 1980.
 
 Donald Wolff, Merle L. Silverstein, Clayton, Mo., Harold M. Weber, St. Louis, Mo., and Ray B. Marglous, Clayton, Mo., for appellants.
 Marc P. Richman, Dept. of Justice, Crim. Div., App. Section, Washington, D.C., for appellee.
 Before LAY, BRIGHT and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 These consolidated criminal appeals concern review of convictions for conducting an illegal bookmaking business and conspiracy to conduct that business. We affirm the substantive charges and reverse the conspiracy charges.
 
 
 2
 All seven defendants (an eighth defendant died subsequent to conviction) were charged in two-count indictments. Count I charged violation of 18 U.S.C. § 1955, 'Prohibition of illegal gambling businesses.' Count II charged conspiracy to violate § 1955.
 
 
 3
 Jury trial was waived and the cases were tried to the court on essentially undisputed facts, including a lengthy stipulation. Two defendants, Lancaster and Lonsberry, chose not to stipulate regarding expert testimony of an F.B.I. agent as to bookmaking customs and procedures. Those defendants were severed and tried separately. They went to trial essentially on stipulated facts except for the expert testimony.
 
 
 4
 All defendants were convicted on both counts. The trial court[1] sentenced each defendant to a prison term and fine on Count I. All defendants received suspended sentences on Count II with a probation period to run consecutively to the sentence on Count I.
 
 
 5
 At the outset we must meet the argument raised by all appellants that the contents of the intercepted oral communications, which formed the greatest part of the government's case, should have been suppressed because the wiretap application was signed by a Deputy Assistant Attorney General and not the Attorney General or his specially designated Assistant Attorney General as required pursuant to 18 U.S.C. § 2516.
 
 
 6
 Since the United States Supreme Court decided United States v. Chavez,416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), this court has twice considered Justice Department procedures almost identical to those which led to the wiretaps in the instant case.[2] United States v. Brick, 502 F.2d 219 (8th Cir. 1974); United States v. Schullo et al., 508 F.2d 1200 (8th Cir. filed January 3, 1975). As in those prior cases the record here indicates that Attorney General Mitchell initialed the wiretap authorization and submitted his affidavit reciting that he had authorized application for the specified interception order. Chavez and this court's opinions following Chavez have found this procedure to be sufficient. See also United States v. Cox,462 F.2d 1293 (8th Cir. 1972).
 
 
 7
 Certain of the appellants further argue that the pen register used by the government to record numbers dialed from certain telephones is not authorized by the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510--2520. We have held otherwise. United States v. Brick,supra, 502 F.2d at 223.
 
 
 8
 Several appellants claim that the affidavit of Robert J. Wilkinson, Special Agent of the F.B.I., was insufficient to demonstrate probable cause and need for the wire interception and the use of the pen register. Citing U.S.Const. Amend. IV; 18 U.S.C. § 2518(1)(c).
 
 
 9
 The affidavit in question is substantially similar to that approved in Brick, supra at 224. There we said:
 
 
 10
 The affidavit presented, that of Robert J. Wilkinson, Special Agent of the F.B.I., set forth in detail his personal observations concerning the investigations conducted, as well as those of two unnamed informants, one of whom had provided reliable information for several years to Special Agents 'on a continuous basis concerning gambling matters.' The affidavit described in detail the operations of the gamblers, and named certain of the persons involved, together with their places of meetings, movements and conversations. In addition it was stated that the informants, noted above, would not testify, nor, as evidenced by past experience, would the gambler's customers; that gambling raids had in the past proved ineffective, as had the telephone toll records.
 
 
 11
 The above representations in the affidavit, in conjunction with others more detailed contained therein, furnished ample probable cause for the order entered and were sufficient to demonstrate on a factual basis, as distinguished from a mere conclusion, that 'other procedures reasonably appear unlikely to succeed.' The statute does not require more. (Footnote omitted.)
 
 
 12
 The same holds true in the instant case.
 
 
 13
 The most serious problem before the court is whether the evidence shows activity which is proscribed by 18 U.S.C. § 1955.[3] That is, whether the facts of this case evidence the sort of illegal gambling business, 'involv(ing) five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business,' that Congress sought to arrest.
 
 
 14
 The parameters of the Congressional intent when enacting § 1955 have now been fairly well defined. Congress sought to draw the line between large scale gambling operations and those that are relatively small. Brick, supra,502 F.2d at 224; Schullo, supra, 508 F.2d at 1204; 116 Cong.Rec. 603 (1970) (remarks of Senator Allot). The statute is not meant to reach gambling operations that are of insignificant monetary proportions or those that are only occasional or intermittent in operation. Schullo, supra at 1204 and citations. Only gambling that is continuous and substantial was to be proscribed. H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Admin.News at 4029.
 
 
 15
 It has further been established that the alleged violator of the statute need not know that the activity engaged in was composed of five or more participants. Brick, supra, 502 F.2d at 224; see also United States v. Smaldone, 485 F.2d 1333, 1348 (10th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); United States v. Iannelli, 477 F.2d 999, 1002 (3rd Cir. 1973), cert. granted, 417 U.S. 907, 94 S.Ct. 2602, 41 L.Ed.2d 211 (1974). However, mere customers of the gambling business are not within the statute's intended reach. Schullo, 508 F.2d at 1205 and citations.
 
 
 16
 Congress was aware that it is oftentimes difficult to prove the workings of an organized gambling setup and surmised that the statute would often operate against gambling networks much larger than the statutory definition of 'five or more' would indicate. S.Rep.No.91--617, 91st Cong.1st Sess. 73 (1969); Schullo, supra at 1205.
 
 
 17
 In the context of the bookmaking business[4] this court has recognized that layoff betting[5] is the major link connecting independent operations into an effective gambling organization that will work profitably and well for all concerned. Schullo, supra at 1205; Brick, supra, 502 F.2d at 225; see also United States v. DeCesaro, 502 F.2d 604, 611 (7th Cir. 1974); United States v. McHale, 495 F.2d 15, 18 (7th Cir. 1974). The layoff system was studied by Congress before it enacted § 1955. See Hearings on S. 30 and related proposals before Subcom. No. 5 of the House Comm. on the Judiciary, 91st Cong. 2d Sess.
 
 
 18
 The government's case rested upon stipulations, the transcribed wiretap conversations (logs) taped from appellant Lancaster's telephone, gambling records seized from several of the appellants' premises, and the expert opinion of Special F.B.I. Agent Whitcomb.
 
 
 19
 The stipulated evidence and logs show that Lancaster and the other appellants were bookmakers. Lancaster received line[6] information from Angelo Del Pietro and Frank Vinceri. Lancaster also exchanged layoff bets with these men. Lancaster passed along the line information he received. At times he would adjust the line information himself before passing it along.[7] Lonsberry took bets from customers for Lancaster and relayed line information to those customers for him. Lancaster and Lonsberry had numerous customers of their own with whom they dealt directly. Vogt maintained customers of his own. He received line information from Lancaster and exchanged layoff bets with him. Christophel discussed line information and layoff betting with Lancaster. Schaefer received line information from Lancaster and discussed line adjustments. Schaefer also bet with Lancaster. The logs disclose that all appellants carried on conversations regarding the status of accounts.
 
 
 20
 Appellants all claim that the evidence does not show one gambling business but several. We disagree.
 
 
 21
 The stipulated evidence and especially the wiretap logs indicate to us that this is the type of sustained and substantial gambling activity which Congress sought to curb. Each appellant was involved in the network of gambling activity interlaced through the Lancaster operation. Compare Brick and Schullo, both supra.
 
 
 22
 We are not persuaded by the contention of appellants Lancaster and Lonsberry that they are 'independent businessmen' and are no different than independent hotel owners who refer customers back and forth and rely on cooperation from each other.[8] It is patently obvious from the legislative history of § 1955 that Congress was well aware that the gambling business is unlike the hotel business or any other business. Nowhere does Congress indicate that it sought to regulate a 'business' only in the sense of central bookkeeping, central cashiers, and central control. The bookmaking business does not operate that way, and the legislators were acutely informed of the fact.
 
 
 23
 The interdependence of the various individual components, including the sharing of line information and the exchanging of profits through layoff betting, outweighs the 'independent businessmen' theory urged by appellants and satisfies us that there was one 'illegal gambling business' here for the purposes of 18 U.S.C. § 1955.[9] Brick, supra, 502 F.2d at 225; United States v. Sacco, 491 F.2d 995, 1003 (9th Cir. 1974) (en banc); United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir. 1972), cert. denied, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973).
 
 
 24
 Appellant Schaefer argues that the evidence does not support the finding that he was a bookmaker. He claims that his transactions with Lancaster were those of a mere customer. Christophel joins with Schaefer in arguing that no layoff betting has been shown as to them and that they should not be included in the business.
 
 
 25
 While the evidence of layoff betting as to these men is not as strong, we are satisfied that they were a part of the loose affiliation which, through continuous communication, conducted this gambling operation.
 
 
 26
 Lancaster and Christophel discussed layoff betting. Close examination of the transcribed conversations which Lancaster had with Schaefer and Christophel discloses discourse which could well be construed as layoff betting. Both men discussed line information with Lancaster and disseminated the line to customers. They also discussed the status of their accounts with Lancaster. These men continuously conferred with and advised each other with respect to various aspects of the gambling business. Viewing the evidence as a whole and in the light most favorable to the government, we are satisfied that Schaefer and Christophel, along with the other appellants, were bookmakers and were systematically and continuously involved in this gambling business.
 
 
 27
 We next turn to the question of whether the conspiracy to violate § 1955, charged in Count II of the indictments, is different in any material respect from the substantive charge of conducting the business. If it is not, the Constitutional provision against double jeopardy voids the conspiracy charge.
 
 
 28
 There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime.
 
 
 29
 Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946). The United States Supreme Court has further held:
 
 
 30
 The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of (a) fact which the other does not. Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1931).
 
 
 31
 An examination of the indictment and the record in this case leads to the conclusion that the conspiracy charge in Count II 'comprehends nothing more than the agreement which (the appellants) necessarily performed by the commission of the substantive offense itself.' United States v. Hunter, 478 F.2d 1019, 1025 (7th Cir. 1973); United States v. Manson, 494 F.2d 804, 808 (7th Cir. 1974). Seven individuals were charged with conducting a gambling business composed of five or more, and seven individuals were charged with conspiracy to conduct a gambling business of five or more. We find no element in the conspiracy which is not present in the completed crime.[10] Pinkerton, supra, 328 U.S. at 643, 66 S.Ct. 1180; Hunter, supra, 478 F.2d at 1026. The Count II conspiracy charges are therefore reversed.
 
 
 32
 Appellants Schaefer, Del Pietro, Lancaster and Lonsberry urge this court to review the sentences received by them.[11] They claim abuse of trial court discretion. Woosley v. United States, 478 F.2d 139 (8th Cir. 1973) (en banc).
 
 
 33
 The severity of a criminal sentence will not be reviewed by this court unless there appears a manifest or gross abuse of discretion or a sentence which has been imposed on a mechanical basis. Woosley, supra; Thompson v. United States, 493 F.2d 480 (8th Cir. filed September 25, 1974).
 
 
 34
 This case is not at all like Woosley. The court obviously apportioned the sentences with care. Nothing in the circumstances or record of the instant case can be construed as an abuse of discretion. Indeed, the sentences reflect careful and logical consideration of each defendant's role in the 'business.'
 
 
 35
 The judgments of conviction on Count II are reversed. The cases are affirmed in all other respects.
 
 
 36
 LAY, Circuit Judge (dissenting).
 
 
 37
 I would reverse the convictions on both counts. Congress did not intend by the enactment of § 1955 to expand federal criminal law so as to rival the power of the states to regulate localized gambling operations.[1] Yet this is the interpretation of § 1955 which is now adopted by the majority opinion. It is inconceivable to me that Congress intended to commit the limited law enforcement resources of the federal government and the federal courts to the regulation of localized bookmaking. The Organized Crime Control Act of 1970, of which § 1955 is a part, was aimed at countering 'organized crime' and its syndicated activities which are carried out on so large a scale as to affect interstate commerce and hence become a national concern. The several gambling provisions of the Act were intended to further its purpose by permitting federal prosecution of those gambling enterprises whose profits flowed to syndicated crime. United States v. Sacco, 491 F.2d 995, 998--999 (9th Cir. 1974) (en banc). The House Judiciary Committee Report states:
 
 
 38
 The intent of section 1511 and section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions. It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions. The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function. (Emphasis added.) H.R.Rep.No.1549, 91st Cong., 2d Sess. (1970); 2 U.S.Code Cong. & Admin. News 1970 at 4029.
 
 
 39
 The majority opinion holds that several individual bookmakers, who do not share phones, customers, profits or losses, or maintain any specific accounting or bookkeeping among one another, can nevertheless fuse themselves into a single illegal gambling business involving five or more persons as proscribed by 18 U.S.C. § 1955. The magic synthesis by which all became one was allegedly accomplished by exchanging line information and, when it was to their individual profit, making layoff bets with the same person. The inevitable result of this decision is to subject all bookmakers to federal prosecution, a result which is contrary to the language and purpose of the Act.[2]
 
 
 40
 The legislative history of § 1955 makes it clear that Congress intended to limit the reach of § 1955 to entities so large and continuous that they might rationally be presumed, at least as a class, to finance organized crime and hence to fall within federal jurisdiction under the commerce power.[3] To that end, the statute requires proof of the existence of a single 'illegal gambling business' involving five or more persons other than customers who 'conduct, finance, manage, supervise, direct or own' the business for at least thirty consecutive days. 18 U.S.C. § 1955(b)(1). In light of this purpose, I cannot conclude that this language, which in common understanding and ordinary commercial usage would refer to a unified, organized business enterprise, was intended by Congress to encompass the isolated activities of these defendants.
 
 
 41
 The statutory language requiring proof that five or more persons conducted a single business commands evidence that each defendant acted in furtherance of the alleged joint business. At oral argument, the government conceded that mere exchange of line information did not evidence involvement in a single bookmaking business. However, the additional proof that defendants exchanged layoff bets with Lancaster with the object of individual profit should be similarly insufficient under the Act.[4] More is needed to show that they were involved in the same business.
 
 
 42
 The majority reasons that Congress could not have intended to require further proof of complicity because bookmakers do not as a rule operate with centralized cashiers, bookkeeping and control, and that Congress was aware of that fact. Yet almost all § 1955 convictions affirmed by the circuit courts have rested on just such a further showing in bookmaking as well as other gambling businesses. Where employees are paid a salary or commission, where co-workers are subject to orders such as use of a uniform line, where several persons use the same office or phones to receive bets, where there is division of functions such as bookkeeping, taking bets and paying off winners, or where there is central handling of revenues, the language of the Act can rightly be invoked. See United States, v. Sacco, 491 F.2d 995, 998 (9th Cir. 1974) (en banc) (division of functions among owners, phonemen and splitters); United States v. Meese, 479 F.2d 41, 42 (8th Cir. 1973) (partnership with 6--8 salaried employees and division of functions); United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir. 1973) (partners employed 12 others at same office); United States v. Fino, 478 F.2d 35, 36 (2d Cir. 1973) (several bet-writers phone bets in to central office with central bookkeeping); United States v. Becker, 461 F.2d 230, 232 (2d Cir. 1972) (owners employed four runners); accord, United States v. Harris, 460 F.2d 1041, 1043 (5th Cir. 1972); United States v. Vigi, 363 F.Supp. 314, 321 (E.D.Mich.1973); United States v. Kohne, 358 F.Supp. 1053, 1064 (W.D.Pa.1973); United States v. Mainello, 345 F.Supp. 863, 883 (E.D.N.Y.1972).
 
 
 43
 In United States v. Bobo, 477 F.2d 974 (4th Cir. 1973), the evidence showed considerably more interaction and evidence of agreement between the defendants than mere exchange of line and layoffs. The Fourth Circuit noted that the bookmakers had developed a system of placing split bets or 'middling' utilizing the differences in the line in various states. Under the system the defendants might not always win, but they could not lose. Id. at 977. Furthermore, they always used a uniform line[5] to 'prevent outsiders from playing them against each other, which was what they were frequently doing to other bookmakers.' Id. at 990. Finally, some of the defendants relayed bets from the others to outside bookmakers as part of their system. Id. at 977.
 
 
 44
 Similarly, in United States v. Ciamacco, 362 F.Supp. 107 (W.D.Pa.), aff'd mem., 491 F.2d 751 (3d Cir. 1973), the central figure, Levine, had an agreement with the individual bookmakers who laid bets off to him whereby he would rebate a percentage of his profits from handling their accounts. Clearly this demonstrates an essential interaction missing here.
 
 
 45
 The analogy drawn to describe the Kotteakos conspiracies is equally appropriate in this case. The appellants' separate bookmaking enterprises formed a pattern of "separate spokes meeting at a common center,' though . . . without the rim of the wheel to enclose the spokes.' Kotteakos v. United States, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). Lancaster was the hub, the common denominator, of otherwise unrelated enterprises. Even his position was, as likely as not, fortuitous. Had another's phone been tapped, that person might have appeared as the hub, and quite a different group of defendants might have been indicted, for the expert admitted that each of those who talked to Lancaster probably sought the opinions of and laid off bets to other bookmakers with equal frequency. That necessary cooperation and loose affiliation are the nature of the bookmaking business, but a higher degree of concerted activity was required by Congress in § 1955. Drawing again on Kotteakos, it is appropriate to remember that
 
 
 46
 (t)hieves who dispose of their loot to a single receiver--a single 'fence'--do not by that fact alone become confederates: they may, but it takes more than knowledge that he is a 'fence' to make them such. Id. at 755, 66 S.Ct. at 1243.
 
 
 47
 Similarly, the fact that all of the appellants used Lancaster to supply some of the necessary information and to take layoffs for their individual businesses does not make them all partners in a single gambling business under § 1955. That too takes more.
 
 
 48
 The majority concedes that proof of the substantive offense under § 1955 requires the same elements as does conspiracy and then reverses the conspiracy convictions as violative of double jeopardy. While I concur in the application of the constitutional principle governing double jeopardy, I conclude that there is insufficient proof either of conspiracy or the substantive offense. In each instance, the prosecution has failed to show that commonality of purpose which would link the defendants into a single gambling business.[6]
 
 
 49
 In Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Court found one overall conspiracy and then commented on Kotteakos:
 
 
 50
 The case therefore is very different from the facts admitted to exist in the Kotteakos case. Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan. 332 U.S. at 558, 68 S.Ct. at 257.
 
 
 51
 Here the government failed to prove one overall general scheme among the parties to conduct a gambling business of five or more persons. There is no proof of any agreement among the defendants generally, but rather a bare showing that several of the defendants each exchanged layoff bets with Lancaster when to do so individually benefited both parties. When it did not benefit one party, proffered layoffs were freely refused, even though in at least one instance that meant that Lancaster sustained a large loss. As in Kotteakos, the defendants in laying off bets with Lancaster may have had similar illegal objectives, but no defendant was interested in whether the others made a profit or not. The government has failed to show that the individual defendants made Lancaster's business 'their own venture.'[7] See United States v. Falcone, 109 F.2d 579, 581 (2d Cir.) (Hand, J.), aff'd, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).
 
 
 52
 In United States v. Aviles, 274 F.2d 179 (2d Cir. 1960), the court commented on the interaction necessary to fuse several independent conspiracies into a larger single combination:
 
 
 53
 A single act may be the foundation for drawing the actor within the ambit of a conspiracy. . . . But, since conviction of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent. Thus, when two men join together to commit a single robbery, one may inter from their common participation in the robbery that they have conspired to commit the robbery. However, in a multiparty conspiracy of the sort revealed in the present case, with actors performing many different tasks in many places, the inference does not necessarily follow from one contact with one member of the conspiracy. 274 F.2d at 189--190.
 
 
 54
 In commenting on Aviles, the Seventh Circuit stated:
 
 
 55
 (A) single act performed with parties who are involved in more than one conspiracy may be insufficient to draw an inference of the existence of an agreement between the parties in the case of multiple conspiracies. Knowledge of the existence of the other parties to the conspiracies is insufficient. While the crime of conspiracy is completed as soon as the unlawful agreement is formed, United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910), it must be shown that this agreement was made prior to or during the consummation of the single act. United States v. Varelli, 407 F.2d 735, 743 (7th Cir. 1969).
 
 
 56
 The primary thesis of the government's case is that there exists an essential network of action between the independent conduct of the defendants with Lancaster to create a common business and thus place their conduct within the scope of § 1955. The majority observes that 'layoff betting is the major link connecting independent operations into an effective gambling organization that will work profitably and well for all concerned.' As earlier discussed this reasoning places every local bookmaker within a federal conspiracy whether he knows it or not. This clearly was not the intent of Congress. In commercial enterprises, wholesale businesses depend on retail establishments to purchase and distribute the goods sold to them by the manufacturers who have made them, each financially dependent on the other--yet, no law suggests that this interrelationship establishes a commonality of a single business. Cf. United States v. Falcone, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).
 
 
 57
 Simply because we deal with criminal legislation we should not twist common terminology from accepted understanding to accommodate the jurisdictional limits of federal prosecution.
 
 
 
 [1]
 The Honorable James H. Meredith, United States District Court, Eastern District of Missouri
 
 
 [2]
 This court delayed decision in several cases, including the instant case, pending the Supreme Court's disposition of Chavez
 
 
 [3]
 The statute provides in relevant part:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section--
 (1) 'illegal gambling business' means a gambling business which--
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 
 
 [4]
 It was stipulated that 'a bookmaker is an individual who is in the business of accepting bets and wagers from bettor-customers on the outcome of sporting events such as baseball, football, basketball, and hockey games, and on horse races. As compensation for the services which he renders, the bookmaker retains the difference between what a bettor-customer is required to risk in order to win a given amount of money and the amount which the bettor-customer can in fact win. The magnitude of the difference is determined by the line or odds issued by the bookmaker on the event which is the subject of the bet or wager.'
 
 
 [5]
 Layoff, it was stipulated, 'is a bet or wager placed by one bookmaker with another bookmaker which is necessitated by the influx of an imbalance of bets and wagers on a given sporting event and which has the effect of distributing the said bets and wagers, thus minimizing the risk of substantial loss.'
 
 
 [6]
 As stipulated, 'a line is an addition to or subtraction from the anticipated point scoring potential of each of the two participating teams which is designed to equalize the betting propositions and thereby to induce the placement of bets by customers on both teams.'
 
 
 [7]
 We reject the claim of appellants that the adjustment of line information negates the concept of one gambling business. The evidence shows that the adjustment of line information serves at times the same as layoff betting to balance books
 
 
 [8]
 Appellants Lancaster and Lonsberry called an expert in hotel management to the stand for the purpose of showing that hotels rely on cooperation in customer and information exchange but are nevertheless separate businesses
 
 
 [9]
 We reject the argument of appellants Christophel and Vinceri that since they stipulated to being in the business only from May 14 through May 28, 1971, the 30-day requirement of § 1955 is not met as to them. The 30-day requirement is an alternative to the $2000 gross revenue requirement. See § 1955(b)(1)(iii) quoted in note 3 supra. The evidence shows that the business had gross revenue in excess of $2000 on both May 18 and May 23, 1971. See United States v. Bridges, 493 F.2d 918, 922 (5th Cir. 1974)
 
 
 [10]
 Before trial defendants moved to dismiss the indictments as duplicitous and violative of double jeopardy. They also moved that the government be required to elect between the counts, again claiming double jeopardy. On appeal the various appellants plead double jeopardy inferentially through their comments and case citations. They rely more heavily on Wharton's Rule. We view the double jeopardy claim as having been adequately raised
 Because we decide that the conspiracy charges in the case violate the Fifth Amendment command against double jeopardy, we need not consider the conflict that has begun to arise in the cases relying on Wharton's Rule and its third party exception as it relates to conspiracy pursuant to 18 U.S.C. § 1955. Compare United States v. Becker, 461 F.2d 230, 234 (2d Cir. 1972), with United States v. Figueredo, 350 F.Supp. 1031, 1032 (D.Fla.1972); see Hunter, supra 478 F.2d at 1024--1026; Comment, Gambling Under the Organized Crime Control Act: Wharton's Rule and the Odds on Conspiracy, 59 Iowa L.Rev. 452, 462--67 (1973).
 
 
 [11]
 The sentences imposed on Count I were: Lancaster, 3 years imprisonment and $10,000 fine; Lonsberry, 2 years and $10,000 fine; Del Pietro and Vinceri, 18 months and $5,000 fine; Christophel, Schaefer and Vogt, 9 months and $5,000 fine
 
 
 [1]
 SENATOR McCLELLAN. I support the very laudable objectives of S. 2022, the illegal gambling business bill. Nevertheless, there are some reservations that I must express. I am concerned that the effect of this bill would be to extend Federal jurisdiction so far that it would be virtually the same as local criminal jurisdiction in this area. Now you have mentioned this problem in your remarks already
 MR. WILSON. We have tried to head that off, and if we haven't done it, it needs to be done, because it is not our purpose to move all this into Federal courts. (Emphasis added.)
 Hearings before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. 396 (1969).
 
 
 [2]
 It is uncontroverted that both the exchange of line information and layoff betting are necessary to 'running a book,' no matter how small. At trial the government's gambling expert, FBI Special Agent T. C. Whitcomb, testified:
 I think we've got to realize that we're speaking about a bookmaking business. Bookmaking by its very nature requires cooperation. Yes. You may have individual enterprises by various bookmakers in an area or a large area or a small area, but the loose affiliation I'm speaking about again requires cooperation between them in exchanging the line information, in taking of friendly bets, for paying for services, furnishing line information, for example, and also to have available certain of these bookmakers which will accept wagering in the terms that we're talking about, lay off, which protects the interests of the individual bookmakers and where one bookmaker lays off this time to another bookmaker, he will reciprocate at a later time and will take lay off from the other individual or may do it all on the same day. This is the nature of the bookmaking business. It can't be escaped.
 Appendix at 401.
 Q. (By Mr. Cashill) Sir, in your opinion, what function does frequent or substantially continuous conversation among bookmakers for the purpose of exchanging lay off bets or wagers or to exchange line information serve insofar as their bookmaking operation is concerned?
 A. It keeps each of the individual bookmakers so involved in these conversations aware of changes, the very important changes, for example, in line or point information that comes across in sporting events. It also permits them to know how the other bookmakers are being bet in case that, as bookmakers have to do from time to time, is adjust their line based on the original line that he had in order to probably attract activity or action or wagers on the other side of an event or more events. Generally, it is this mutual coopration again that I speak about, the nature of bookmaking, independently organized, but must cooperate above the better level in order to continue to function adequately.
 Appendix at 392--93.
 If that necessary cooperation in itself proves that the participants are conducting the same illegal gambling business, then the requisite five persons can always be found and the statutory limitation is rendered meaningless.
 
 
 [3]
 The justification for federal jurisdiction is premised on the rational connection between large-scale gambling and the flow of commerce. United States v. Sacco, 491 F.2d 995 (9th Cir. 1974). Thus, the constitutionality of the Act rests in large measure on its limited application to illegal operations of national concern. For the federal government now to expand the Act's prohibitions to local activities is to betray the congressional purpose
 
 
 [4]
 This is not to suggest that persons who place and accept layoff bets are immune from prosecution under § 1955 as mere customers. Congress intended layoff bettors in some instances to be within the reach of the statute. Cf. United States v. DeCesaro, 502 F.2d 604, 611 (7th Cir. 1974); United States v. McHale, 495 F.2d 15, 18 (7th Cir. 1974). However, in my view something more than mere acceptance of those bets is needed to show that both are involved in the same business. That something extra could be demonstrated, as in United States v. Ciamacco, 362 F.Supp. 107 (W.D.Pa.), aff'd mem., 491 F.2d 751 (3d Cir. 1973), by the existence of an agreement to rebate a percentage of the profits to layoff bettors. In addition, it might be sufficient if the government could show, over a period of several weeks, that the 'layoff man' never refused to accept proffered bets or at least that he attempted to help the others place theirs if he did not want to accept them himself. That was not the case here, for these defendants refused to take layoffs, even from Lancaster, their supposed 'boss,' when it was not necessary to balance their own books on an individual basis
 
 
 [5]
 The evidence showed that defendants in this case did not always use the same line. Yet the government's own expert witness testified that within a single bookmaking business, a uniform line was essential
 
 
 [6]
 The Third Circuit recently reversed convictions for the related offense of conspiracy to facilitate an illegal gambling business under 18 U.S.C. § 1511 (also enacted as part of the Organized Crime Control Act of 1970) for lack of evidence that five or more persons were involved. United States v. Riehl, 460 F.2d 454 (3d Cir. 1972). The court found that while one defendant was indeed selling 'punchboards' for gambling purposes in violation of state law, and two others were arguably engaged in helping him do that, nevertheless there was no showing that five persons were involved. The defendant's employees did not handle the punchboards. The others were found to be merely customers, who bought the punchboards and used them for gambling purposes. Their independent character was not lost merely because they purchased the essential supplies for their type of gambling business from a common supplier. Since they did not kick back any of the profits to the punchboard supplier, the court found that they were not involved in his business for purposes of the statute, but rather 'operated for their own account.' Id. at 460. The analogy to bookmakers who cooperate only by sharing line information and exchanging layoff bets should be clear; while they do receive essential supplies from one another, that is not enough to create the danger of true large-scale organized crime the statute was intended to reach
 
 
 [7]
 As I view the evidence, only Lancaster's 'business' involved more than one person. Lonsberry and Athanas 'the co-defendant who died before sentencing) sometimes relayed customer bets to Lancaster and collected losses from Lancaster's customers on his behalf. This would involve three persons in his business, but not the requisite five or more