**UNITED STATES of America**

**v.**

**Eugene LAWSON et al.**

**Crim. A. No. 71-53.**

United States District Court,
E. D. Pennsylvania.

July 17, 1972.

wealth Development Association of Pennsylvania, Inc., in Commonwealth Court at the present time.

Robert C. Ozer, Sp. Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Louis C. Johanson, Paul Yermish, Philadelphia, Pa., Charles V. Bell, Charlotte, N. C., Voluntary Defender Assoc. Philadelphia, Pa., for defendants.

## MEMORANDUM

HUYETT, District Judge.

Defendants were found guilty after trial by jury of conspiracy to receive, conceal, transport, and sell heroin in violation of the Federal narcotics laws, 21 U.S.C. § 174, 26 U.S.C. §§ 4704(a), 4705(a), 7237(a), 7237(b).[1] On November 4, 1971, trial on the three-count indictment commenced against six defendants[2] and on December 2, 1971, a jury returned a verdict of guilty against each defendant on all three counts. Each contended in post-trial motions that his motion for judgment of acquittal was erroneously denied at the conclusion of trial and that the verdict was contrary to the weight of the evidence. Alternatively, each sought a new trial because of events that occurred during trial. On June 19, 1972, argument was held on defendants' various post-trial motions. At the conclusion of argument all post-trial motions except Katherine Mayberry's motion for judgment of acquittal were denied. Her motion for judgment of acquittal was granted. The purpose of this Memorandum is to set forth in some detail the reasons for the ruling of the Court from the bench on June 19, 1972.

## MOTIONS FOR JUDGMENT OF ACQUITTAL

Since the trial was rather lengthy, no attempt will be made to review all of the evidence offered by the Government to prove its case. A summary, however, of the evidence relied upon to dispose of the motions for acquittal follows.

The evidence indicated that the Government's investigation commenced at least as early as April, 1970, and culminated with the arrest of defendants tried in October, 1970. Pursuant to Court orders entered in this district and

---

1. Pretrial motions were disposed of in United States v. Lawson, 334 F.Supp. 612 (E.D.Pa.1971).

2. Defendant James Wright and the United States entered into a stipulation that the trial of Wright be severed from the other

defendants in this case and further consideration of his pretrial motions be deferred until the final outcome of criminal proceedings already commenced against him in the Southern District of New York. Defendant Delores Glover had not been apprehended at time of trial.

in the District of New Jersey communications were intercepted on telephone lines subscribed to by Eugene Lawson at his residence in Atco, New Jersey, and his place of business, Up Look Record Co. in Philadelphia, Pa. Edward W. Cassidy, an agent of the Bureau of Narcotics and Dangerous Drugs, testified extensively concerning his supervision of the intercept procedures in the case. He testified that his experience as a narcotics investigator convinced him that certain slang expressions recurring throughout the intercepted conversations had particular meanings to people involved in the traffic of narcotics.

From the Government's explanation of the intercepted conversations and the related surveillance, the jury could reasonably conclude, and apparently did conclude, that:

(1) On April 30, 1970, Wilberta Lawson travelled by bus to Apartment 5, 146 W. 120th Street, in New York City to pick up an order of heroin and cocaine for Eugene Lawson.

(2) On the way home from New York City, Wilberta Lawson delivered a package of narcotics to the Philadelphia residence of Walter Meadows at 3:00 or 4:00 A.M. on May 1, 1970.

(3) Bernice Wilcox made similar pick-ups for Eugene Lawson.

(4) When arrested on October 2, 1970, Walter Meadows was in possession of two bags of heroin and had never been treated anywhere for addiction.

(5) In October, 1970, Eugene Lawson was attempting to purchase a kilogram of pure heroin from James Wright in New York City for approximately $27,000.

(6) On October 6, 1970, Eugene Lawson, under surveillance, visited an apartment at 146 W. 120th Street, New York City. He left the premises with several packages that he placed in the trunk of his car. Shortly thereafter he was followed onto the New Jersey Turnpike and arrested. Searches of his car and person uncovered substances that were subsequently identified as: (a) 30.9 grams of pure heroin; (b) 1.15 grams of a mixture of cocaine hydrochloride and sugar; and (c) twenty ¼ ounce blocks of mannite, a substance used to adulterate heroin for street use.

(7) On October 6, 1970, a search was conducted of the premises of Apartment 5, 146 W. 120th Street, New York City. The narcotics and narcotic-related materials that were seized there can best be described as being of factory proportions. The heroin, cocaine, cutting or adulterating materials, scales and plastic bags that were seized were introduced as Government exhibits 11 through 32.

(8) On October 5, 1970, Willie J. Rhynes sent a $1200 money order for Eugene Lawson to the Western Union office in Philadelphia. The money order listed the sender as Willie R. Hynes. On October 5, 1970, a conversation between Rhynes and Eugene Lawson indicated that Lawson was going to pick up something for Rhynes the next day. It also indicated that since this was "the first time" Lawson wanted to personally show Rhynes "what to do". Although Rhynes testified that the $1200 was sent to Lawson for a legitimate business purpose, the totality of the circumstances entitled the jury to conclude that the money was sent to acquire narcotics from the purchase that Eugene Lawson made in New York City the next day.

The above brief outline of the evidence introduced at trial leaves this Court convinced that the cases involving those defendants implicated were properly submitted to the jury.

■ Viewed in retrospect, however, the evidence presented against defendant Katherine Mayberry was substantially weaker than that presented against the other defendants. Personal surveillance by Government agents indicated only that she was a receptionist at Eugene Lawson's Up Look Record Co. in Phila-

delphia. The only telephone conversations involving Katherine Mayberry that were intercepted indicate at most that she was a drug *user*—not a *dealer*. These conversations were not even with any of the other alleged conspirators, and, indeed, were absolutely void of any incriminating references to other alleged conspirators.

It is also noteworthy that one of the intercepted Katherine Mayberry conversations indicates that she was anxious to receive a quantity of drugs from an unknown person who called her at Up Look Record Co. If, in fact, she were a member of this apparently large scale narcotics conspiracy, it would be unnecessary and probably more costly for her to purchase her drugs from an outsider.

Consequently, although there was sufficient credible evidence to link the other defendants to a conspiracy to purchase, conceal, transport, and sell narcotics, only the vaguest speculation could lead the jury to include Katherine Mayberry in that conspiracy. For that reason the motion of Katherine Mayberry for judgment of acquittal was granted but similar motions by the other defendants were denied.

## MOTIONS FOR NEW TRIAL

Defendants also alleged the commission of many prejudicial errors in the conduct of the trial. Only those allegations that concern the handling of the intercepted conversations during trial, however, will be discussed.

Initially, defendants contended that the recordings of the intercepted conversations were entirely too unintelligible to be admitted into evidence. In United States v. Schanerman, 150 F.2d 941 (3 Cir.1945), the only Third Circuit case uncovered dealing with this problem, the Court held that:

"No error is found, as charged by appellant, in the refusal of the district court to instruct the jurors to disregard what they had heard when records of conversations between appellant and Finneran were 'played' in the hearing of the jury during the trial . . . . [T]he mere fact that certain portions of the mechanically recorded conversations were less audible than others did not call for exclusion of what the jurors personally heard from the 'playing' of the records. There would be no more valid reason for exclusion of the mechanically recorded conversations than there would be for excluding competent conversations, overheard in part, by human witnesses."

In Monroe v. United States, 98 U.S. App.D.C. 228, 234 F.2d 49, 55 (1956), cert. denied, 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956), the standard for admissibility of tape recordings was phrased as follows:

"Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge."

Indeed, this standard for admissibility has been uniformly followed by the Courts. See United States v. Kaufer, 387 F.2d 17, 19 (2 Cir.1967); United States v. Knohl, 379 F.2d 427, 440 (2 Cir.1967), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967); United States v. Madda, 345 F.2d 400, 403 (7 Cir.1965); Johns v. United States, 323 F.2d 421 (5 Cir.1963); Addison v. United States, 317 F.2d 808 (5 Cir.1963) (admission of conversation upheld where only one half of tape was understandable); Gorin v. United States, 313 F.2d 641, 652 (1 Cir.1963); Todisco v. United States, 298 F.2d 208 (9 Cir.1961), cert. denied, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962).

During the pretrial proceedings in the instant case, the Government voluntarily supplied to all defendants transcripts of the intercepted wire communications. So that the Court could rule preliminarily upon the admissibility of the recordings that the Government proposed to introduce at the trial, I entered an Order dated October 5, 1971, requiring the

Government to prepare for use at trial 20 copies of an exhibit consisting of an accurate transcript of all conversations believed relevant with the speakers identified in accordance with the Government's contention. The Order also required the Government to prepare an accurate single tape for use at trial containing only those conversations which the Government would seek to have introduced at the trial.

At the pretrial hearings held on November 1, 1971, November 3, 1971, and November 4, 1971, prior to the formal commencement of the trial and attended by defendants and their counsel, I personally compared the tape recordings with the written transcripts prepared by the Government pursuant to my October 5, 1971 Order. Special Agent Cassidy, who supervised both the interceptions and the transcript preparation, testified extensively concerning the procedures that he and his staff followed in the transcript preparation. He conceded that in preparing the transcripts he listened to some of the tapes a dozen or more times before reaching his final conclusion as to the content of the conversations. Moreover, in some tapes he was unable to reach a conclusion as to the content of portions of the tapes. These inaudible portions were so indicated on the transcripts by the insertion of question marks where the apparently incomprehensible speech occurred. After careful consideration it was concluded, despite the contrary opinion of defense counsel, that the transcripts were an accurate depiction of the contents of the tape recordings except for some minor discrepancies which were considered immaterial.

■ The defendants were unquestionably correct that both the poor sound quality of some recordings and the frequently rapid and slurred speech of the speakers made certain tapes less than crystal clear. Although portions of the conversations were somewhat unintelligible, I was convinced, however, the significant parts were not. To paraphrase the words of the Court in Cape v. United States, 283 F.2d 430, 435 (9 Cir. 1960), the thread of the conversations, though thin in places, was never completely broken. For that reason the tapes were allowed to be played for the jury.

■ Secondly, defendants contended that even if the recordings were properly admitted into evidence, the Court committed serious error in allowing written transcripts of the recordings to be used at the trial. It should be noted that subsequent to defendants raising this point, the judges of this Court adopted virtually the same transcript procedure followed in this case.[3]

Since the sound quality of the tapes admittedly was less than excellent and the speech patterns furthered the difficulty in understanding the tapes, I decided that the only fair and feasible way to have the jury effectively consider the recordings was to utilize the transcripts as a listening aid. Other methods of presenting the intercepted conversations to the jury would have been unduly prejudicial either to the prosecution or the defense. On the one hand, simply to play the recordings for the jury one time without the aid of the transcripts would have rendered some of the conversations ineffective as evidence under the circumstances of this case. On the other hand, to play each recording several times to the jury would have unduly prolonged the trial, and possibly caused prejudice to defendants by excessive repetition of Government evidence. Thus, since I was convinced that the tran-

---

3. Local Criminal Rules of the United States District Court for the Eastern District of Pennsylvania, Local Rule 16(c) (2):

"  .   .   .   . Within a reasonable time before trial, the Court may rule preliminarily upon the admissibility of such evidence, whereupon all communications to be admitted may, as the Court directs, be recorded on a single tape together with a sufficient number of transcripts for the Court, counsel and each member of the jury.  .   .   . "

scripts were in all material respects accurate, I adopted a procedure which I deemed fair to both sides.

On direct examination, Special Agent Cassidy was permitted to read the prepared transcripts of the recorded conversations. He was also permitted to express his opinion as to the meaning of certain words and expressions from his experience as a narcotics investigator. The tapes were then played for the jury. As each tape was played, the jury had in their hands copies of the Government prepared transcript to follow the conversation. This was the only time during the entire trial that the jury was permitted to see the transcripts. Immediately prior to the playing of each conversation transcripts of a particular recording were distributed to the jury. As each conversation concluded, the transcripts were immediately collected from the jury. The transcripts were not sent out with the jury during deliberations.

Although I mentioned to the jury that I was satisfied with the accuracy of the transcripts except for some minor discrepancies which were considered immaterial, I repeatedly stressed to them that it was the sole province of the jury to determine whether there were any discrepancies. Furthermore, at the playing of virtually every conversation and again in the charge, the jury was instructed that if they perceived differences between what they read in the transcripts and what they heard on the tapes, it was what they heard on the tapes that governed entirely.

Defendants argued strenuously that the above outlined transcript procedure "programmed" the minds of the jury to hear exactly what the Government contended in its transcripts was said on the tapes. This possibility was considered and rejected for several reasons. Firstly, I was satisfied that the transcripts were accurate in all material respects. Secondly, the jury was continuously warned to be governed by what they heard if they perceived any discrepan-

cies. Thirdly, defendants were free at all times to point out any transcript discrepancies through cross-examination of Special Agent Cassidy or additional tape plays. Finally, a more workable procedure, fair to both prosecution and defense, was unavailable.

Defendants cited the following sparse language of the Third Circuit in Schanerman, supra, 150 F.2d 941, 944 for the proposition that it was error to permit the use of transcripts at all:

> "Transcribed notes, made by a stenotype operator from hearing the records repeatedly 'played', were properly excluded . . ."

*Schanerman* dealt with notes transcribed by a stenotype operator whereas the instant case involved transcripts prepared by the agent who had directed and participated in the interceptions and had personally familiarized himself with the voices of the defendants. In addition, *Schanerman*, handed down in 1945, was not decided with a view toward how best to implement a comprehensive electronic surveillance statute such as that involved in the instant case. In view of these differences, the single phrase in *Schanerman* hardly seemed dispositive.

Defendants argued that the cases allowing written transcripts justify the use of such transcripts only for the limited purpose of aiding in the identification of the speakers. *See* Fountain v. United States, 384 F.2d 624 (5 Cir. 1967), cert. denied, sub nom. Marshall v. United States, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); United States v. Hall, 342 F.2d 849 (4 Cir. 1965). Defendants, however, overlooked two cases which approved the extensive use of written transcripts to facilitate the presentation of recorded testimony.

In United States v. Koska, 443 F.2d 1167 (2 Cir.1971), the jury was not only allowed to read a government prepared transcript while listening to five hours of tape, but also to use twelve copies of the transcript during deliberations. While in *Koska* the transcript was stipulated as accurate except in two immate-

rial respects and no such stipulation occurred here, I was satisfied as to the accuracy of the transcripts before permitting the jury to see them. Furthermore, to the extent that the *Koska* jury was permitted to use the transcripts during deliberations the use made of the transcripts in the instant case was more limited. Similarly, Lindsey v. United States, 332 F.2d 688 (9 Cir.1964) approved the reading of a transcript to the jury despite the defense objection that this procedure would give the Government a "second shot" at proving the contents of the conversations.

All the factors set forth above were considered in evaluating defendants' claim that the transcript procedure followed constituted prejudicial error. I remain convinced, however, that the procedure followed provided the most reasonable means of presenting telephonic interceptions to the jury.

Defendants' various other allegations of prejudicial trial error were also carefully considered and denied for lack of merit.