540 F.2d 503
 2 Fed. R. Evid. Serv. 212
 UNITED STATES of America, Appellee,
v.
Jerome DiMURO et al., Defendants-Appellants.
UNITED STATES of America, Appellee,
v.
Roland LUNG, Defendant-Appellant.
UNITED STATES of America, Appellee,
v.
Victor SANTARPIO, Defendant-Appellant.
UNITED STATES of America, Appellee,
v.
Joseph DOHERTY and Thomas Hurley, Defendants-Appellants.
 Nos. 75-1225 to 75-1228.
 United States Court of Appeals,
First Circuit.
 Argued March 2, 1976.
Decided June 29, 1976.
 
 Avram G. Hammer, George F. Gormley, Boston, Mass., by appointment of the court, Charlotte Anne Perretta, Boston, Mass., by appointment of the court, David Rossman, Boston, Mass., by appointment of the court and Owen F. Brock, Boston, Mass., with whom Gorfinkle & Hammer, Judith E. Diamond, Harrington & Gormley, and Keating, Perretta & Pierce, Boston, Mass., were on brief, for defendants-appellants.
 Kenneth A. Holland, Atty., Dept. of Justice, Washington, D. C., with whom James N. Gabriel, U. S. Atty., Jeffrey M. Johnson, Special Atty., Boston Strike Force, Boston, Mass., and Shirley Baccus-Lobel, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.
 Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 After trial to a jury appellants were convicted on a one count indictment charging them with conducting an illegal gambling business in violation of 18 U.S.C. § 1955.[1] On this appeal they raise a number of claims variously challenging the applicability of § 1955 to their acts and the sufficiency of the evidence, as well as claims directed to the propriety of certain evidentiary admissions in the course of trial.[2]
 
 
 2
 Appellants' first contention is that the trial court erred in ruling that the government did not have to prove their various gambling operations were a "single business,"[3] and that the government's evidence failed to show the existence of a single gambling operation. This issue is best examined in light of the factual circumstances of the present case. The government's evidence at trial was derived from two main sources: wiretapped conversations from a telephone line used by appellant Santarpio covering the period June 3 through June 15, 1971; and a large quantity of gambling paraphernalia seized from five separate locations as the result of searches carried out on November 13, 1971.
 
 
 3
 In regard to the wiretaps, appellant Santarpio was a participant in each of the twenty-five conversations introduced at trial. In one set of intercepted conversations he called appellants Hurley and Doherty at 585 Boulevard in Revere, Massachusetts, and provided them with information on various horses; in turn he was informed by the two appellants about results from certain racetracks in New York, New Jersey, Delaware and elsewhere. In a second set of calls Santarpio was shown to have telephoned appellants Colangelo, DiMuro and Mantica who allegedly ran a gambling operation out of the Handy Lunch Shop and the Marsh Club (which were adjacent to one another on American Legion Highway in Revere). In these conversations Santarpio asked for and obtained race results, and received the betting "line" for certain professional sports. See United States v. Schaefer, 510 F.2d 1307, 1311 & n.6 (8th Cir.), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). He also placed a wager with appellant DiMuro, and a "lay off" bet[4] with appellant Mantica. There were also discussions of how much was owed Santarpio as a result of various bets certain of these appellants previously had made with him. A third set of conversations was between Santarpio and appellant Roland Lung at 23A Tyler Street in Boston. In one instance Santarpio called Lung to inform him that a horse in a certain race was a favorite and to tell him the odds he ought to accept on the horse. In other instances Lung telephoned Santarpio to convey race results and to "lay off" certain wagers with him. In one of the calls from Lung there was a discussion of how much he and Santarpio owed one another as the result of several days' wagering. In sum, the wiretap evidence tended to show Santarpio as a pivotal figure with whom the other appellants exchanged race results and betting information and with whom certain of the appellants "laid off" bets.
 
 
 4
 Appellants contend that while the betting slips and other paraphernalia seized from the four locations noted above may indicate separate small scale gambling operations at each of these places, there was no unified gambling business. Specifically, they claim that the transmittal of gambling information and the sporadic acceptance of lay off wagers are insufficient to merge what were unconnected bookmaking operations into a § 1955 offense, and that there was not sufficient evidence to connect together the various groups of appellants who dealt separately with Santarpio into a unified business relationship.
 
 
 5
 These claims cannot prevail. The exchange of line and other gambling information are necessary and useful functions in a gambling enterprise and persons who carry out such functions have been held to be engaged in "an illegal gambling business." United States v. Joseph, 519 F.2d 1068, 1071 (5th Cir. 1975), cert. denied, 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312, 44 U.S.L.W. 3471 (1976); United States v. Schaefer, supra at 1311; United States v. Ceraso, 467 F.2d 653, 656 (3d Cir. 1972). Similarly persons who make and accept lay off bets have been found to perform an indispensible task in the maintenance of an illegal gambling business. United States v. Thomas, 508 F.2d 1200, 1205 (8th Cir.), cert. denied, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 100 (1975); United States v. Sacco, 491 F.2d 995, 1002-03 (9th Cir. 1974) (en banc); see United States v. Schaefer, supra at 1312.
 
 
 6
 With regard to the sufficiency of the evidence on this issue, close examination of the transcribed conversations between the various appellants and Santarpio discloses discourse dealing with the exchange of line and other gambling information and/or lay off betting. While the evidence with respect to some of these activities is stronger for certain of the appellants than for others, there is a reasonably clear indication that each of them frequently conferred with Santarpio concerning various aspects of a gambling business. Viewing the evidence as whole and in the light most favorable to the government, we are satisfied that all the appellants were systematically involved in a gambling business. See United States v. Schaefer, supra at 1312-13; United States v. Sacco, supra at 1004.[5]
 
 
 7
 Appellants also challenge as unlawful the June, 1971 intercepts on the telephones used by Santarpio, and claim that the evidence obtained therefrom should have been suppressed. There are two aspects to their challenge. First, they contend that then Attorney General Mitchell improperly delegated his power to authorize an application seeking approval of the intercepts in question. Specifically, appellants point to the language of18 U.S.C. § 2516 which provides that an Assistant Attorney General may be "specially designated" to authorize such an application. They note that in the present case the memorandum initialed by Attorney General Mitchell provided that Assistant Attorney General Wilson was "specially delegated" to make the authorization. They contend that this choice of language (i. e., "delegate" instead of "designate") amounted to an illegal transfer of authority to an assistant which only the Attorney General himself was empowered to exercise. However, we do not find this claim to be persuasive. There was no misidentification of the Assistant Attorney General whom the Attorney General sought to designate. See United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). The fact that the word "delegate" was used is of little consequence and does not constitute a failure to comply fully with the requirements in Title III such as would render the interception of wire or oral communications "unlawful." See id. at 574-75, 94 S.Ct. 1849.
 
 
 8
 Appellants also contend that the application for the telephone intercepts did not set forth an adequate justification as to why the wiretaps were needed and that it failed to provide a full and complete statement as to why other investigative procedures would not suffice. See 18 U.S.C. § 2518(1)(c) and (3) (c). We do not find merit in these claims.
 
 
 9
 An examination of the affidavit presented to the district court in support of an order for a wire intercept and a pen register[6] on telephone facilities at 58 Delano Avenue, Revere, indicates there was adequate basis for the court to have found probable cause that the facilities in question were being used in activities that violated § 1955. The affidavit, prepared by Special Agent Lucksted of the FBI, set forth information received from three confidential informants who were indicated to have provided reliable information on unlawful gambling activities on numerous previous occasions. Each of the informants was known by the agent to be engaged in gambling operations, and information provided by each was based upon personal observations and contacts with the unlawful gambling enterprise allegedly conducted at 58 Delano Avenue.
 
 
 10
 One of the informants was said to have indicated that between March and May, 1971 certain named individuals (one Shane and one Plotkin)[7] who were personally known to him were using for their gambling operation the telephones at the location in question; that the informant himself had "exchanged . . . wagering information" with both men; and that he had placed bets with them over the telephone for a number of months as recently as May, 1971. From discussions with Shane and Plotkin this informant had learned that their operation grossed in excess of $10,000 business a day and that they laid off bets with other Massachusetts bookmakers. A second confidential informant provided joint information about the April and May, 1971 period to another FBI special agent who in turn had conveyed this information to the affiant, agent Lucksted. The informant, through his contacts in the gambling business, had been furnished with phone numbers (corresponding to those at 58 Delano Avenue) to call in order to place bets on sporting events. The informant had placed bets with two different persons at these numbers on several occasions, as recently as the second week of May, 1971.
 
 
 11
 The information of a third informant was also relayed to Lucksted through another FBI agent.[8] This informant, who knew Shane and Plotkin, had placed bets with both individuals and had been present when they discussed their bookmaking operation. He had also placed bets over the telephone facilities at 58 Delano Avenue as recently as the third week of May, 1971.
 
 
 12
 The affidavit in question thus clearly provided "some of the underlying circumstances from which the officer concluded that the informant . . . was 'credible' or his information 'reliable.' " Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). Each of the informants was shown to have been reliable on previous occasions and the circumstances from which the agents concluded that the information each provided was credible was set forth in detail.[9] In sum, the information provided by these informants was sufficient to justify a finding of probable cause for the issuance of an intercept order. See United States v. Armocida, 515 F.2d 29, 36 (3d Cir. 1975); United States v. McHale, 495 F.2d 15, 17-18 (7th Cir. 1974).
 
 
 13
 We also do not agree with appellants' assertion that the wiretapping application did not provide an adequate statement as to why other investigative procedures would not succeed. See 18 U.S.C. § 2518(1)(c) and (3)(c).[10] The Lucksted affidavit indicated that although information from government informants could pinpoint 58 Delano Avenue as the site of a gambling business, the informants would not testify for fear of their own safety. Agent Lucksted also explained that on the basis of his experience and that of his colleagues in investigating gambling operations, searches of individuals and of the situs of the gambling business would be unlikely to produce evidence necessary to prove all the elements of a § 1955 violation since records frequently are not kept; that whatever records are kept may be destroyed before the law enforcement officers are able to seize them; and that records which have been seized have generally been insufficient to identify all participants.
 
 
 14
 While we think that a court ruling on the sufficiency of a wiretap application can "consider the nature of the alleged crimes" and give some " weight to the opinion of . . . investigating" officers "that in the described circumstances other means . . . might be counterproductive if pursued," In re Dunn, 507 F.2d 195, 197 (1st Cir. 1975) (per curiam), nevertheless we believe that an agent's bare conclusory statement that normal investigative techniques are generally unproductive in dealing with gambling operations is insufficient to meet § 2518(1)(c)'s requirements. United States v. Kalustian,529 F.2d 585 (9th Cir. 1976). If mere conclusions by the affiant based solely on past experience that gambling conspiracies are "tough to crack" were held sufficient to authorize a wiretap, the government would need to show "only the probability that illegal gambling is afoot to justify electronic surveillance." Id. at 589.
 
 
 15
 In the present case, however, the affidavit does not rest on such assertions alone. It states, in addition, that since 58 Delano Avenue was located in a quiet residential area, any "fixed physical surveillance" would be "impractical"; that because Delano Avenue was "only one block long" any strange vehicle "passing by this address with any frequency would draw immediate attention"; and that because the building at the address in question was a one-story residential house where the curtains were "usually closed" it was "impossible to see inside" from a "fixed or moving" observation post. Although the factual underpinnings of the affidavit could have been more substantial, we believe it "provided a sufficient factual statement to enable the court to find as it did, that normal investigative procedures reasonably appeared unlikely to succeed if tried . . . ." In re Dunn, supra at 197.
 
 
 16
 Appellants also contend that the district court erred in denying their request for an evidentiary hearing to determine whether evidence offered by the government was tainted by various allegedly unlawful wire interceptions.[11] We do not agree. Four interceptions are involved in appellants' claim. None of these intercepts, however, was specifically directed at any of the appellants, and materials from all the intercepts were furnished to the defense. Apart from contending that information from the intercepts might have formed the basis for search warrants at certain of the gambling locations a claim we reject, see discussion infra appellants are unable to suggest any specific basis in support of their claim that the government's evidence at trial might have been tainted by these interceptions.[12] Although the government has the ultimate burden of persuasion to show that its evidence is untainted, Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969), nevertheless appellants must come "forward with specific evidence demonstrating taint." Id. Under the circumstances of the present case, where appellants failed to provide some minimal demonstration of a basis for their allegation of taint, we cannot say it was improper for the trial court to decline to hold the extensive evidentiary hearings which would have been required.
 
 
 17
 Appellants also claim it was improper for the trial court to allow the government to introduce a composite tape containing only those conversations which it wanted to play for the jury at trial.[13] They further contend that the government's presentation of only twenty-five out of a total of 668 intercepted gambling conversations was inherently unfair because it left "an inescapable impression that the (composite trial tape) was merely a sampling of what constituted continuous dealings among the defendants." However, these claims cannot prevail. The admissibility of recordings of intercepted conversations or parts thereof is a matter committed to the sound discretion of the trial court.[14] Gorin v. United States, 313 F.2d 641, 652 (1st Cir. 1963); Todisco v. United States, 298 F.2d 208, 211 (9th Cir. 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962). And the use of a composite trial tape of particular intercepted conversations which the government considered relevant to the trial has been permitted. See, e. g., United States v. Lawson, 347 F.Supp. 144, 147-49 (E.D.Pa.1972). In the present case appellants concede that the entire corpus of intercepted conversations, involving fourteen reels of tape "were replete with gambling conversations. . . . ," and we see no basis for a claim that the government was required to present to the jury every conversation intercepted pursuant to a court authorized wire interception order.[15] Moreover, while there could be circumstances where selectivity in the preparation of a composite trial tape might be prejudicial, here appellants had access to the original tapes and were given ample opportunity on cross-examination to bring out the total number of intercepted conversations in which each appellant was personally involved.
 
 
 18
 Nor do we find merit in appellants' claim that the arrangement of the conversations on the composite trial tape was improper because it created an "illusion of unity among the parties" which did not exist.[16] Conversations involving a particular appellant were grouped together to facilitate the presentation of identification testimony. Had conversations not been aggregated in this way there would have been a proliferation of identifications which would have involved "the inconvenience and confusion of stopping the tape between each speaker and permitting (testimony) to identify the next speaker," Fountain v. United States, 384 F.2d 624, 632 (5th Cir. 1967), cert. denied, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968), and this process might "possibly (have) caused prejudice to defendants by excessive repetition . . . ." United States v. Lawson, supra at 148. In sum, we cannot say the district court's handling of the use of the composite tape at trial was improper or amounted to an abuse of its discretion.[17]
 
 
 19
 Appellants also contend on a variety of grounds that the voice identifications at trial were unreliable and improper. Specifically, they complain that there was a considerable lapse of time between the interceptions and the identifications, and that certain of the identifications were tainted because based in part on conversations obtained through a wiretap in July, 1971, which was held to be illegal. We are not persuaded by either claim. With regard to appellant Santarpio (who was involved in all twenty-five conversations on the composite tape), the voice identification was made by Special Agent Kennedy who had spoken with Santarpio for an extended period on February 3, 1975, and more briefly on March 28 of that year. After the first conversation Kennedy listened to copies of the original intercepted conversations and identified Santarpio's voice. Santarpio contends that since there was a four-year interval between the recording of the intercepted conversations and the voice comparison, the identification was necessarily unreliable. However, Fed.R.Evid. 901(b)(5) provides that "(i)dentification of a voice, whether heard firsthand or through . . . electronic . . . recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" is sufficient for the admissibility of voice identification evidence. (Emphasis added.) The trial was held before the Rules took effect, but they provide useful guidance; appellant Santarpio cites no cases indicating that different considerations should govern this type of situation prior to the Rules. The two confrontations between agent Kennedy and the appellant provided an adequate basis for the identification testimony to be submitted to the jury.[18]
 
 
 20
 Appellants Mantica and DiMuro challenge the admissibility of their voice identifications principally on the ground that these identifications were based on conversations overheard through illegal intercepts. The relevant facts are as follows. Conversations involving both appellants had been intercepted in concededly unlawful wiretaps.[19] At trial, however, the government presented voice identifications that it claimed were based on independent grounds. Specifically, agent Daly testified that he had spoken with appellant DiMuro at his home for a short period on December 22, 1971, and again approximately a year later at the federal courthouse. Daly likewise spoke with Mantica at his residence in November, 1971 and twice at the courthouse nearly a year later. In the case of both appellants agent Daly testified that his voice identification derived from a comparison of the voice he heard during the course of his personal confrontation with each of them and an analysis of the intercepted conversations introduced at trial. Daly conceded, however, that he had been exposed to the illegally intercepted conversations. Appellants contend the possibility that this prior exposure may have affected Daly's identification of their voices renders the identification totally defective and inadmissible. We do not agree. Although the content of communications obtained from an illegal wiretap is subject to an evidentiary prohibition, see Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), we do not think the exposure of agent Daly to appellants' voices from an illegal wiretap falls within that prohibition. "The physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. . . . No person can have a reasonable expectation that others will not know the sound of his voice. . . . " United States v. Dionisio, supra 410 U.S. at 14, 93 S.Ct. at 771. Moreover, voice identification testimony may be based on hearing the voice at any time if the exposure occurs under circumstances connecting the voice to the speaker. Fed.R.Evid. 901(b)(5). Here, on several occasions agent Daly met with each appellant under circumstances where he could connect the voices to their persons, see id., and consequently there was an adequate independent basis for his identification testimony.
 
 
 21
 With regard to the other appellants our examination of the record reveals nothing in their respective voice identification procedures that was "impermissibly suggestive." Agent Daly identified appellant Hurley's voice in the telephone conversations from the June, 1971 intercepts after a personal confrontation on August 19, 1974. As to appellants Colangelo and Doherty, voice exemplars were taken and agent Daly made voice identifications based on a comparison of these exemplars with the intercepted conversations. We see no impropriety in this procedure.[20] See, e. g., United States v. Whitaker, supra at 165; United States v. Chiarizio, 525 F.2d 289 (2d Cir. 1975).
 
 
 22
 With respect to appellant Lung we also think that there was sufficient evidence to show he was a participant in the conversations. In one intercepted conversation Lung, who had called Santarpio, identified himself by his first name ("Roland") and upon request gave his home telephone number. A voice "exemplar was taken of that call" and also submitted to the jury. We do not agree with appellant's contention that because he allegedly has "marked racial speech characteristics" this procedure was "impermissibly suggestive and created a substantial likelihood of misidentification." "(I)t is (clear) beyond dispute that identification of a telephone caller may be (established) by circumstantial evidence" United States v. Bozeman, 495 F.2d 508, 510 (5th Cir. 1974), cert. denied, 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975), which "may be as persuasive to identify the . . . party . . . as testimony" based on voice recognition. United States v. Zweig, 467 F.2d 1217, 1220 (7th Cir. 1972), cert. denied, 409 U.S. 1111, 93 S.Ct. 921, 34 L.Ed.2d 692 (1973).
 
 
 23
 Appellants also challenge the propriety of the searches at various locations and the admissibility of evidence seized therefrom. We examine the different claims separately. Appellants Colangelo, DiMuro, and Mantica contend that the items seized on November 13, 1971 from the Handy Lunch and the Marsh Club as well as from 65 Endicott Avenue should have been suppressed because the supporting affidavits contained information derived from unlawful wire interceptions.[21] The government concedes that information from the telephone wiretaps which were subsequently held to be illegal, see n. 1 supra, was included in the affidavits accompanying the search warrants for the Handy Lunch and Marsh Club locations. However, "inclusion in an affidavit of indisputably tainted allegations does not necessarily render the resulting warrant invalid. The ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." United States v. Giordano, 416 U.S. 505, 555, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341 (1974) (Powell, J. concurring in part and dissenting in part). See United States v. McHale, supra at 17. In the instant case the affidavit also contained information supplied by a confidential informant which, standing alone, was adequate to show probable cause. The informant provided information based on personal observations that appellant DiMuro (with whom the informant was acquainted), and others were conducting a gambling business at the Handy Lunch and the Marsh Club from May until at least the last week of October, 1971; that he had placed bets over the telephone at the above locations as recently as the last week of October, 1971; and that during the same time period he had also observed gambling records there. The informant also stated on the basis of personal observation that as recently as the last week of October, 1971 appellants DiMuro, Mantica and others had moved from these locations but that appellant Colangelo was still operating there.[22] The affidavit also indicated that surveillance by law enforcement officials had disclosed that vehicles registered to a number of the appellants were present in the vicinity of the Handy Lunch.
 
 
 24
 With regard to the search warrant for 65 Endicott Avenue, unlawful wire interceptions played no part in the determination of probable cause which was predicated solely upon information supplied by the same confidential informant as above. Our examination of this affidavit likewise indicates ample basis for a finding of probable cause to issue a warrant. Accordingly, appellants' motions to suppress evidence seized from the three locations in question were properly denied.
 
 
 25
 Certain of the appellants also contend that the search warrants for 585 Boulevard and 23A Tyler Street were invalid because the information in the supporting affidavits was too "stale" to support a showing of probable cause. They point to the fact that the affidavit for the November, 1971 search is based primarily on intercepted conversations from the two locations gleaned from wiretaps and a pen register on the telephone facilities at 58 Delano Avenue in June, 1971. While we have observed that a warrant's validity depends in part on "the proximity or remoteness of the events observed," Rosencranz v. United States, 356 F.2d 310, 316 n. 3 (1st Cir. 1966), nevertheless the determination of timeliness as an element in probable cause must be by the circumstances of each case. Bastida v. Henderson, 487 F.2d 860, 864 (5th Cir. 1973); cf. Sgro v. United States, 287 U.S. 206, 210-11, 53 S.Ct. 138, 77 L.Ed. 260 (1932). In the present case the affidavits for the search warrants for the two locations in question were part of a master affidavit which was submitted in support of warrants for several other locations as well. This affidavit reported numerous intercepted calls during June, 1971 from the Delano Avenue address to each of the locations (including the two locations whose search is challenged here). With regard to many of the other locations there was ample additional information which, as noted earlier, clearly showed continued gambling operations in force at least through the last week of October, 1971. While this additional information obviously cannot serve to demonstrate probable cause for the two challenged locations, nevertheless it can serve as an indication of the protracted and continuous nature of the operations under investigation, cf. United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972); Durham v. United States, 403 F.2d 190, 194-95 & n. 7 (9th Cir. 1968), and in conjunction with the recitation of numerous intercepted calls to the two locations, can serve to demonstrate the probability of a continuing violation. Under these circumstances we believe the court below reasonably concluded that the gambling enterprise which functioned in June had remained operative in November, and we do not disturb its finding as to probable cause.
 
 
 26
 Appellants Colangelo, DiMuro, Lung and Santarpio, who were named in the original indictment, contend that they were deprived of their sixth amendment right to a speedy trial because of a thirty-three month delay between the initial indictment in September, 1972 and the commencement of trial in May, 1975 (the second indictment having been returned in August, 1974).[23] This claim cannot prevail, however, when considered in light of the factors set forth by the Supreme Court in Barker v. Wingo, 407 U.S. 514, 530-33, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). See United States v. Morse, 491 F.2d 149, 156-57 (1st Cir. 1974); United States v. Cabral, 475 F.2d 715 (1st Cir. 1973); see also United States v. Fay, 505 F.2d 1037 (1st Cir. 1974). Prior to trial on the initial indictment appellants moved to dismiss and to suppress all evidence derived pursuant to allegedly illegal wire interceptions. As noted earlier, on April 19, 1973, the magistrate entered an order to which all defendants consented, including the appellants who now complain of delay staying all proceedings pending the decision by the Supreme Court in United States v. Giordano, supra. As a result of the Court's decision the initial indictment was dismissed without prejudice and the government obtained a superseding indictment in August, 1974. Under these circumstances it is clear the delay in question was not initiated by the government "to gain some tactical advantage over (the appellants) or to harass them," United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971), nor was the thirty-three month interval a "deliberate attempt to delay the trial in order to hamper the defense . . . ." Barker v. Wingo, supra 407 U.S. at 531, 92 S.Ct. at 2192. The trial on the original indictment was delayed for a wholly legitimate purpose to avoid the cost and ordeal of a trial on the basis of evidence which subsequently might have been (and was) declared inadmissible. Moreover, the appellants, who were released on bail during the pendency of any indictment against them, consented to the stay. Appellants also have shown no prejudice from the delay, nor have they demonstrated that their defense was injured. Accordingly, we find no violation of the right to a speedy trial.[24]
 
 
 27
 Appellants also contend the trial judge erred in denying their motions to dismiss. Specifically, they claim that the indictment returned by the grand jury was invalid because the letter of authority assigning Jeffrey M. Johnson, an attorney in the Organized Crime and Racketeering ("Strike Force") Section of the Department of Justice, to assist in federal prosecutions in the District of Massachusetts, failed to comply with the requirement of 28 U.S.C. § 515(a) (1970) that any special attorney be "specially directed" to carry out particular legal proceedings. We have, however, recently rejected just such a contention and do so here in reliance on our earlier opinion. United States v. Morrison, 531 F.2d 1089 (1st Cir. 1976).
 
 
 28
 Appellant Mantica claims that the indictment against him cannot stand because he was previously immunized from prosecution. He points to the fact that he was subpoenaed to appear before a special grand jury on February 2, 1972, which was inquiring into possible violations of § 1955. At that time he invoked his fifth amendment privilege against self-incrimination and refused to answer questions. On February 9 the government obtained an order compelling Mantica to testify under a grant of transactional immunity pursuant to 18 U.S.C. § 2514.[25] Mantica again appeared, refused to testify and was held in contempt by the district court; in an unpublished order we affirmed that judgment. Despite the fact that he never actually testified, Mantica nevertheless contends that the grant of immunity continued in effect. We find no merit to this claim. A grant of immunity is coextensive with the privilege against self-incrimination, see Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and no immunity is earned until the witness in fact testifies. Marcus v. United States, 310 F.2d 143, 148 (3d Cir. 1962), cert. denied, 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969 (1963). "So long as he refuses to testify he is still subject to prosecution, if the government can make out a case against him by other evidence than his own." Id.
 
 
 29
 Appellants Colangelo, DiMuro and Mantica complain that the trial court erred in admitting into evidence two portions of expert testimony, viz. a computation by agent Whitcomb (based on wagering slips seized from 585 Boulevard) indicating that there were over $52,000 in wagers for a single day at that location, and the agent's analysis of Colangelo's handwriting in a notebook seized from another location. They contend that this evidence should have been excluded because the government failed to make prior disclosure of its existence or to notify defense counsel prior to the offer as required by the district court's uniform rules for automatic discovery.[26] We do not find this claim to be persuasive. The defense was provided with all the documents on which the computations and handwriting analysis were based. The agent's testimony concerning his calculations as to total wagers on a single day is clearly permissible, see United States v. Morrison, supra at 1094-95. The defense was informed at a pre-trial hearing that there would be expert testimony regarding handwriting, and it was not deprived of an opportunity to challenge the analysis. Under these circumstances we cannot say the district court abused its discretion in permitting this testimony. United States v. Baxter, 492 F.2d 150, 174 (9th Cir.), cert. denied, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38 (1973); see United States v. Hauff, 473 F.2d 1350, 1355 (7th Cir.), cert. denied, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973); United States v. Saitta, 443 F.2d 830 (5th Cir.), cert. denied, 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250 (1971).
 
 
 30
 We have examined appellants' other assignments of error and do not find them to be of merit.
 
 
 31
 Affirmed.
 
 
 
 [1]
 Specifically, appellants were charged with conducting the illegal operation for the period June 1 through November 13, 1971. One of the essential requirements of an "illegal gambling business" under § 1955 is that the operation must involve "five or more persons who conduct, finance, manage, supervise, direct, or own all or part" of the business. 18 U.S.C. § 1955(b) (1)(ii). An initial indictment, returned September 12, 1972, charged appellants DiMuro, Colangelo, Lung and Santarpio plus sixteen other defendants with a violation of § 1955. On April 19, 1973, acting on motions to dismiss and to suppress evidence (derived from allegedly illegal wiretaps), the United States Magistrate stayed all proceedings pending a decision by the Supreme Court in United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The Court decided that case on May 13, 1974. On September 3 of that year, because certain counts in the indictment were based on information from telephone interceptions which were unlawful in light of Giordano, the district court dismissed the indictment against all the defendants without prejudice. A subsequent indictment against all the appellants in the present case was returned on August 22, 1974
 
 
 [2]
 We treat most of the issues on this appeal as if raised by all the appellants, since in large part they have adopted one another's arguments by reference. Where certain issues are relevant only to particular appellants we so indicate
 
 
 [3]
 This issue dominated the initial portion of the trial. On the fifth day the trial court ruled as follows:
 "I am going to make it a rule of the case, the government's burden of proof is not to prove a single gambling business.
 ". . . .ng
 ". . . The question is not how many different businesses there are, as long as a defendant is in business with the people on trial, he is in trouble."
 The court also refused appellants' requests for jury instructions to the effect that the government had to prove the existence of a single gambling business beyond a reasonable doubt.
 
 
 [4]
 Special Agent Whitcomb, Chief of the FBI Gambling Unit Laboratory headquarters, described the "layoff" process in bookmaking operations as follows:
 "It is a method by which a bookmaker will wager similar to the way of the bettor. If he has heavy action on one side, it gives him an imbalanced book, should his bettors' selection win, he would have a big pay out. If he cannot by changing the line of the odds thus attract attention to the other side, to even his action, his wagering on both sides of the events, he can resort to a lay off. It is nothing more than for him to go and bet with another bookmaking operation, in the same way he is being bet into. (This way) he has insurance against his losses (and) he can cut down his risks."
 See United States v. Schaefer, 510 F.2d 1307, 1311 n.5 (8th Cir.), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975).
 
 
 [5]
 Certain of the appellants also contend that even if their assertedly separate gambling operations in different locations would suffice to constitute a violation of § 1955, it was improper for the trial court to allow evidence of gambling activities from each of the separate locations to be admitted against all appellants. Specifically, they claim that the gambling paraphernalia seized in November from each of the locations should have been admitted only against those persons actually involved. This claim, however, cannot prevail. Alleged violators of § 1955 need not know that the activity they are engaged in also involved numerous other participants. United States v. Brick, 502 F.2d 219, 224 (8th Cir. 1974). The fact that various of the appellants may have had separate relationships with Santarpio does not make their activity an independent business unassimilable into one overall operation. The legislative history of § 1955 indicates that Congress was aware that "bookmaking" does not operate as a unified, centrally coordinated and controlled business enterprise. United States v. Schaefer, supra, at 1311-12. Given that each appellant was involved in the network of gambling activity revolving around Santarpio, it was not improper for the trial judge to admit evidence from each of the component operations against all appellants whose operations were, in effect, interdependent. Id.; cf. United States v. Bobo, 477 F.2d 974, 988 (4th Cir. 1973), cert. denied, 421 U.S. 909, 95 S.Ct. 1557, 43 L.Ed.2d 774 (1975)
 
 
 [6]
 A pen register records the number dialed from a particular telephone. See United States v. Schaefer, supra at 1310
 
 
 [7]
 Although the affidavit did not set forth the names of any of the appellants in the present case, it did state that in addition to the named individuals who were committing a violation of 18 U.S.C. § 1955 there were "others as yet unknown" also involved in the commission of this offense
 
 
 [8]
 Appellants argue that the information received from informants two and three could not be relied on to support probable cause since it had not been conveyed directly to the affiant, agent Lucksted. We find little merit to this claim. See United States v. McCoy, 478 F.2d 176, 179 (10th Cir.), cert. denied, 414 U.S. 828, 94 S.Ct. 53, 38 L.Ed.2d 62 (1973); United States v. DeCesaro, 502 F.2d 604, 607 n.6 (7th Cir. 1974). The district court was fully apprised as to the basis for the original informants' information viz. their personal observations and contacts. Moreover each of the informants was known to the affiant to be involved in the gambling business
 
 
 [9]
 Moreover, the information from the informants, which was based on personal observation and experience, involved events reasonably close in time to the date of the requested intercept order. Accordingly, appellants' contention that the affidavit relied on "stale" information cannot avail. See United States v. Guinn, 454 F.2d 29, 36 (5th Cir.), cert. denied, 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972); see also United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975); United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972); State v. Tella, 113 R.I. 303, 321 A.2d 87 (1974)
 
 
 [10]
 Section 2518(1)(c) provides that a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."
 
 
 [11]
 The intercepts referred to by appellants are:
 
 
 [1]
 a court authorized interception on telephone facilities used by Anthony M. St. Laurent conducted from July 22 to August 2, 1970;
 
 
 [2]
 an intercept (conducted at the same time (i. e., June, 1971) as the intercept in the present case) over telephones at 63 Beckford Avenue; information from this intercept was recited in the affidavits for the search warrants at 23A Tyler Street and 585 Boulevard;
 
 
 [3]
 the July, 1971 intercepts at the Handy Lunch and Marsh Club which the government concedes were unlawful and information from which was included in affidavits accompanying search warrants for the two locations, see discussion infra ; and
 
 
 [4]
 four additional interceptions conducted during August to October, 1971 pursuant to gambling investigations
 
 
 [12]
 In this regard appellants made only a very general claim to the trial court, viz. that "there were so voluminous wire taps that they pervade the entire case so that because of the pervasive nature of the information obtained by the government in these wiretaps it is now impossible to determine without the most difficult inquiry as to whether any item of evidence in the possession of the government is derived from the illegal wiretaps or not."
 
 
 [13]
 Appellants also urge that it was improper for the jury to be provided a transcript of the edited tape at trial. Specifically, appellants contend that because the transcript bore the names and initials of the alleged participants in the left margin, it was impermissibly suggestive. We do not agree with this contention. The use of "an accurate transcript of all conversations believed relevant with the speakers identified . . . " has been allowed. See, e. g., United States v. Lawson, 347 F.Supp. 144, 148 (E.D.Pa.1972). In the present case the composite tape was arranged in segments so as to show each appellant's participation in the conversations. Prior to the playing of each segment the government introduced testimony as to the identity of the principal participant and all those conversations were then played for the jury. (This procedure was followed with respect to all of the conversations except one, involving appellants Mantica and Santarpio.)
 Prior to the distribution of the transcript the trial court instructed the jury that it was only "(f)or the purpose of assisting you in following the conversation . . . "; that the presence of names and initials on the left side of the transcripts "is not evidence of the identity of the persons speaking . . . (which) is something for you to determine on the basis of your listening to the tapes and certain voice exemplars and the testimony of certain witnesses. . . . " Under these circumstances we cannot say that the presence of appellants' names in the tape transcript was unfairly prejudicial. See United States v. Hall, 342 F.2d 849, 853 (4th Cir.), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 (1965).
 
 
 [14]
 Although only the composite tape was played for the jury, all the recorded conversations were received in evidence. And appellants were afforded the opportunity to examine the original tapes of all the intercepted conversations
 
 
 [15]
 Appellant Santarpio urges that 18 U.S.C. § 2518(8)(a) which provides in pertinent part that "the recording of the contents of any wire or oral communication . . . shall be done in such way as will protect the recording from editing or other alterations" bars the presentation at trial of a composite tape. We are not persuaded of the merit of this claim. The primary purpose of § 2518(8)(a) is to ensure accuracy of recordings at the time of monitoring and to require sealing to deter alterations. See, e. g., United States v. Poeta, 455 F.2d 117, 121-22 (2d Cir.), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). The statute does not apply to the preparation of a trial tape of selected intercepted conversations whose accuracy is not at issue
 
 
 [16]
 Appellants' claim on this question attempts to reargue, at least in part, their contention that the government had to prove the existence of a single gambling business as opposed to an assortment of unconnected enterprises. We have, however, already rejected this claim. See discussion supra
 
 
 [17]
 Appellants also contend it was improper for the trial court not to order the deletion of obscene language from the recordings of the intercepted conversations and the trial tape transcript. Specifically, they claim that the inclusion of such language was irrelevant to any matter before the jury and "could function only to create the impression that the speakers were men of bad character." To say in the light of present day mores that appellants were unduly prejudiced by a failure to clean up their language is frivolous, not to mention the burden the government might have run to avoid the inference that it was omitting something material. Cf. United States v. Whitaker, 372 F.Supp. 154, 164 (M.D.Pa.), affirmed 503 F.2d 1400 (3d Cir. 1974)
 
 
 [18]
 Santarpio also argues that the fact that he invoked his right to remain silent on February 3, 1975, bars the utilization of voice identification testimony based on conversations (with agent Kennedy) subsequent to the exercise of his fifth amendment privilege. However, this claim must fail. The government is entitled to use subsequent non-testimonial utterances for purposes of a voice identification, since Santarpio can have no reasonable expectation of privacy as to the sound of his voice. United States v. Dionisio, 410 U.S. 1, 14, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973)
 
 
 [19]
 During parts of July, 1971 the government monitored telephone facilities at the Handy Lunch and the Marsh Club in Revere. Appellants DiMuro and Mantica were found to have participated in certain of the intercepted conversations. On January 9, 1972, agent Daly had testified to a federal grand jury that the above interceptions indicated appellants DiMuro, Mantica and Colangelo were involved in a gambling operation at the two locations. The government stipulated at trial that these interceptions were unlawful
 
 
 [20]
 Appellants DiMuro, Mantica, and Colangelo also contend that their voice identifications were improperly introduced because there was no corroborating evidence of their identities apart from the identifications made by agent Daly. We are not, however, persuaded by this claim. Daly's voice identifications were unequivocal, and under such circumstances there would appear to be no need for corroborating evidence. Cf. United States v. Bozeman, 495 F.2d 508, 510 (5th Cir. 1974), cert. denied, 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975)
 
 
 [21]
 These appellants also challenge the admission of this evidence on grounds of relevancy. Specifically, they contend that there is no showing of continuity between the wiretapped conversations in June, 1971 and the gambling paraphernalia seized in November, and that none can be presumed to exist. We need not pass upon this issue in detail, however, since the requirement that a gambling operation otherwise in violation of § 1955 be in operation for 30 days can also be satisfied alternatively, where, as here, the gross revenue exceeds $2,000 in a single day. See 18 U.S.C. § 1955(b)(1)(iii); United States v. Schaefer, supra at 1312 n. 9; cf. United States v. Bridges, 493 F.2d 918, 922 (5th Cir. 1974)
 
 
 [22]
 The affidavit also set forth an adequate indication of the informant's reliability, viz. that he was acquainted with gambling operations in the greater Boston area; that he had furnished reliable information regarding gamblers and bookmakers to FBI agents on 75 occasions within the previous two years information which had been verified by other confidential sources or by independent investigation by the FBI and other law enforcement agencies
 
 
 [23]
 Appellants seem to contend that it was improper for the government to seek a second indictment. This claim, however, lacks merit. De Marrias v. United States, 487 F.2d 19, 21 (8th Cir. 1973), cert. denied, 415 U.S. 980, 94 S.Ct. 1570, 39 L.Ed.2d 877 (1974)
 
 
 [24]
 Other of the appellants who were not named in the original indictment claim that the government deprived them of due process of law under the fifth amendment by waiting until August 22, 1974, to indict them for illegal conduct occurring between June and November, 1971. However, this claim cannot avail. Appellants have failed to demonstrate that the pre-indictment delay was intentional or designed to give the government a tactical advantage. Moreover, they have not shown any actual prejudice stemming from the preaccusation delay. See United States v. White, 470 F.2d 170, 174-75 (7th Cir. 1972); United States v. Daley, 454 F.2d 505, 508 (1st Cir. 1972). Accordingly, we find no violation of due process. See United States v. McClure, 153 U.S.App.D.C. 370, 473 F.2d 81, 83 (1972); United States v. Deutsch, 440 F.2d 651, 652 (7th Cir. 1971), cert. denied, 404 U.S. 1014, 92 S.Ct. 668, 30 L.Ed.2d 661 (1972)
 
 
 [25]
 Section 2514 provided in pertinent part:
 "No such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding . . . against him in any court."
 It was subsequently repealed. See Pub.L. No. 91-452, Title II, § 227(a), 84 Stat. 930.
 
 
 [26]
 These rules provide in pertinent part:
 "A. The Government shall disclose, and allow the defendant to inspect, copy and photograph, all written material as follows:
 " . . .Gov
 "3. All relevant reports or results of physical or mental examinations and of all scientific tests, experiments and comparisons, or copies thereof, made in connection with a particular case.
 "4. All books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which the Government intends to use at the trial of the case, except reports, memoranda and other internal government documents made by the government agents in connection with the investigation and prosecution of the case."